1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10              SAN JOSE DIVISION

11

12   MYMAIL, LTD.,                          Case No. 17-CV-04487-LHK

13              Plaintiff,                   **ORDER GRANTING OOVOO'S
                                            MOTION FOR JUDGMENT ON THE
14       v.                                 PLEADINGS**

15   OOVOO, LLC,                            Re: Dkt. No. 62

16              Defendant.

17

18   MYMAIL, LTD.,                          Case No. 17-CV-04488-LHK

19              Plaintiff,                   **ORDER GRANTING IAC'S MOTION
                                            FOR JUDGMENT ON THE
20       v.                                 PLEADINGS**

21   IAC SEARCH & MEDIA, INC.,              Re: Dkt. No. 101

22              Defendant.

23

24       Plaintiff MyMail, Ltd. ("MyMail") filed patent infringement actions against Defendants

25   ooVoo, LLC ("ooVoo") and IAC Search & Media, Inc. ("IAC") (collectively, "Defendants").

26   MyMail alleges that Defendants infringe claims of U.S. Patent No. 8,275,863 ("the '863 Patent")

27   and U.S. Patent No. 9,021,070 ("the '070 Patent"). Before the Court are Defendants' motions for

                                           1

judgment on the pleadings.  *See* ooVoo ECF No. 62; IAC ECF No. 101.[1]  Having considered the

submissions of the parties, the relevant law, and the records in these cases, the Court GRANTS

Defendants' motions for judgment on the pleadings.

## I.       BACKGROUND

### A. Factual Background

#### 1.   The Parties

Plaintiff MyMail is a "Texas Limited Partnership" with a primary place of business in

Athens, Texas.  ooVoo ECF No. 1 ¶ 1.  MyMail is the assignee of the '863 and '070 Patents.  *Id.* ¶

9.  Defendant ooVoo is a Delaware corporation with its primary place of business in New York,

New York.  *Id.* ¶ 2.  Defendant IAC is Delaware corporation with its primary place of business in

Oakland, California.  IAC ECF No. 1 ¶ 2.

#### 2.   The Patents

The '863 Patent is titled "Method of Modifying a Toolbar."  ooVoo ECF No. 1 Exh. 1

('863 patent).  It was filed on April 16, 2003, and issued on September 25, 2012.  The '070 Patent

is titled "Dynamically Modifying a Toolbar."  *Id.* Exh. 2 ('070 patent).  It was filed on June 20,

2013, and issued on April 28, 2015.  The two patents are related.  Specifically, the '070 Patent is a

continuation of U.S. Application No. 13/573,311, which in turn is a continuation application of the

'863 Patent.  Thus, the '863 Patent and the '070 Patent contain similar claims, have identical

figures, and have nearly identical specifications.

The patents state that they relate "in general to digital data networks and, more particularly,

to network access and to minimizing unauthorized interception of data and denial of network

services."  '863 patent at col. 1: 26-29.  However, the patents also describe a method for updating

toolbars or "button bars" that are displayed on Internet-connected devices such as personal

computers.  *Id.* at col. 10:7-11:16.  Specifically, the patents disclose a toolbar database that stores

---

[1] "ooVoo ECF No." denotes docket entries in Case No. 17-CV-4487-LHK, *MyMail, Ltd. v. ooVoo, LLC.*  "IAC ECF No." denotes docket entries in Case No. 17-CV-4488-LHK, *MyMail, Ltd. v. IAC Search & Media, Inc.*

Case No. 17-CV-04487-LHK
Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS

data defining the attributes of the toolbar, like button captions and button functionality. *Id.* at col. 10:38-11:4. When the device that displays the toolbar is connected to the Internet, the device executes software called a "client dispatch application" that initiates a "pinger" to update the toolbar database, along with other databases. *Id.* at col. 11:44-47, 12:16-17, 17:30-32. The pinger sends information about those databases to a network server, which in turn uses the sent information to determine whether any of the databases require updates. *Id.* at col. 11:47-52, 12:17-24, 17:32-40. If any updates are required, the server sends those updates to the device. *Id.* at col. 17:40-66.

MyMail asserts claims 1–5, 9–13, 16–17, 19–20, and 23 of the '863 Patent, but identifies claim 1 as the representative claim. ooVoo ECF No. 70 at 4. Similarly, MyMail asserts claims 1–13 and 15–22 of the '070 Patent, but identifies claim 1 as the representative claim. *Id.* at 5. Claim 1 of the '863 Patent recites:

1. A method of modifying a toolbar, comprising the steps of:

a user Internet device displaying a toolbar comprising one or more buttons, the toolbar defined by toolbar data stored in one or more toolbar-defining databases, the toolbar data comprising a plurality of attributes, each attribute associated with a button of the toolbar, wherein for each button of the toolbar, at least one of the plurality of attributes identifying a function to be performed when the button is actuated by the user Internet device;

the user Internet device automatically sending a revision level of the one or more toolbar-defining databases to a predetermined network address;

a server at the predetermined network address determining, from the revision level, the user Internet device should receive the toolbar update data;

the user Internet device receiving toolbar update data from the Internet;

the user Internet device initiating without user interaction an operation to update the toolbar data in accordance with the toolbar update data received;

the user Internet device updating, by the operation, the toolbar data in accordance with the toolbar update data, thereby producing updated toolbar data, the updating comprising at least one of the following steps (a) and (b), each respectively comprising:

United States District Court
Northern District of California

(a) writing at least one new attribute to the original toolbar data, wherein the writing at least one new attribute to the toolbar data comprises changing the one or more buttons of the toolbar by adding a button; and

(b) updating at least one attribute of the toolbar data; and

the user Internet device displaying the toolbar as defined by the updated toolbar data.

'863 patent at col. 29:28-63. Similarly, claim 1 of the '070 Patent recites:

1. A method for dynamically modifying a toolbar, the method comprising:

displaying the toolbar, at a user Internet device, that includes one or more toolbar buttons, the toolbar defined by toolbar data stored in one or more toolbar-defining databases, the toolbar data comprising a plurality of toolbar button attributes associated with the one or more toolbar buttons of the toolbar, wherein at least one of the plurality of toolbar button attributes identifies a function to be performed by a specific toolbar button upon actuation of the specific toolbar button;

invoking, from the user Internet device without user intervention, communication of information associated with the one or more toolbar-defining databases to a server associated with a network address;

receiving, at the server, the information associated with the one or more toolbar-defining databases;

determining, based on the information associated with the one or more toolbar-defining databases, that the user Internet device should receive updated toolbar data;

receiving, at the user Internet device, the updated toolbar data in response to determining that the user Internet device should receive the updated toolbar data;

initiating, at the user Internet device and without user interaction, an operation to update the toolbar data in accordance with the received updated toolbar data;

updating the toolbar data at the user Internet device based on the operation and in accordance with the updated toolbar data, thereby updating the toolbar data, the updating comprising at least one member of a group comprising (a) and (b):

(a) updating the toolbar data to include at least one new attribute of the toolbar data to change the toolbar by adding a toolbar button to the toolbar; and

(b) updating the toolbar data to modify an attribute of at least one of the one or more toolbar buttons of the toolbar; and

4

displaying at the user Internet device the toolbar as defined by the updated toolbar data,

wherein the information associated with the toolbar data includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number.

'070 patent at col. 29:40-30:20.

### B. Procedural History

On November 18, 2016, MyMail filed its complaint for patent infringement against Defendant ooVoo in the United States District Court for the Eastern District of Texas. *See* ooVoo ECF No. 1. Then, on December 20, 2016, MyMail filed its complaint for patent infringement against Defendant IAC in the same court. *See* IAC ECF No. 1.

On February 2, 2017, ooVoo moved to dismiss MyMail's action for improper venue, answered MyMail's complaint, and asserted counterclaims against MyMail. ooVoo ECF Nos. 18 & 19. On February 3, 2017, MyMail opposed ooVoo's motion to dismiss for improper venue. ooVoo ECF No. 24.

Similarly, on February 13, 2017, IAC moved to dismiss MyMail's action for improper venue, answered MyMail's complaint, and asserted counterclaims against MyMail. IAC ECF Nos. 16 & 17. On that same day, MyMail opposed IAC's motion to dismiss for improper venue. IAC ECF No. 20.

On February 23, 2017, MyMail answered ooVoo's counterclaims. ooVoo ECF No. 27. On March 6, 2017, MyMail answered IAC's counterclaims. IAC ECF No. 27.

On July 11, 2017, the United States District Court for the Eastern District of Texas transferred both of MyMail's actions to this district. ooVoo ECF No. 33; IAC ECF No. 70. MyMail's action against ooVoo was originally assigned to Magistrate Judge Susan van Keulen, *see* ooVoo ECF No. 35, while MyMail's action against IAC was originally assigned to Magistrate Judge Joseph Spero. *See* IAC ECF No. 72. However, MyMail declined Magistrate Judge

5

jurisdiction in both actions. ooVoo ECF No. 36; IAC ECF No. 74. Thus, on September 1, 2017, MyMail's action against ooVoo was reassigned to the undersigned judge, ooVoo ECF No. 38, while MyMail's action against IAC was reassigned to Judge Phyllis J. Hamilton. IAC ECF No. 77.

On October 2, 2017, MyMail filed a motion to relate MyMail's action against IAC to MyMail's action against ooVoo. ooVoo ECF No. 48. On October 10, 2017, this Court granted MyMail's motion to relate. ooVoo ECF No. 55. As a result, MyMail's action against IAC was reassigned to the undersigned judge. IAC ECF No. 93.

On October 31, 2017, Defendants filed the instant motions for judgment on the pleadings. ooVoo ECF No. 62; IAC ECF No. 101 (collectively, "Mot."). Defendants' motions are identical. On November 21, 2017, MyMail opposed Defendants' motions. ooVoo ECF No. 70; IAC ECF No. 109 (collectively, "Opp."). MyMail filed the same opposition in both actions. On December 5, 2017, Defendants filed the same reply in both actions. ooVoo ECF No. 71; IAC ECF No. 110 (collectively, "Reply").

## II. LEGAL STANDARD

### A. Motion For Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (brackets and internal quotation marks omitted). Like a motion to dismiss under Rule 12(b)(6), a motion under Rule 12(c) challenges the legal sufficiency of the claims asserted in the complaint. *See id.* Indeed, a Rule 12(c) motion is "functionally identical" to a Rule 12(b)(6) motion, and courts apply the "same standard." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (explaining that the "principal difference" between Rule 12(b)(6) and Rule 12(c) "is the timing of filing"); *see also U.S. ex rel.*

United States District Court
Northern District of California

*Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).

Judgment on the pleadings should thus be entered when a complaint does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(c) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

**B. Patent Eligibility Challenges Under 35 U.S.C. § 101**

Defendants' motions argue that the patents-in-suit fail to claim patent-eligible subject matter under 35 U.S.C. § 101 in light of the U.S. Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014). The ultimate question whether a claim recites patent-eligible subject matter under § 101 is a question of law. *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) ("Patent eligibility under § 101 is an issue of law[.]"); *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014) (same). However, the Federal Circuit has identified that there are certain factual questions underlying the § 101 analysis. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018). Accordingly, a district court may resolve the issue of patent eligibility under § 101 by way of a motion for judgment on the pleadings. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014) (affirming determination of ineligibility made on motion for judgment on the pleadings).

Although claim construction is often desirable, and may sometimes be necessary, to resolve whether a patent claim is directed to patent-eligible subject matter, the Federal Circuit has

United States District Court
Northern District of California

explained that "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). Where the court has a "full understanding of the basic character of the claimed subject matter," the question of patent eligibility may properly be resolved on the pleadings. *Content Extraction*, 776 F.3d at 1349; *see also Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, 72 F. Supp. 3d 521, 539 (D. Del. 2014), *aff'd sub nom. Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369 (Fed. Cir. 2016).

**C. Substantive Legal Standards Applicable Under 35 U.S.C. § 101**

**1. Patent-Eligible Subject Matter Under 35 U.S.C. § 101**

Section 101 of Title 35 of the United States Code "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). Under § 101, the scope of patentable subject matter encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Id.* (quoting 35 U.S.C. § 101). These categories are broad, but they are not limitless. Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354 (citation omitted). These three categories of subject matter are excepted from patent-eligibility because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (citations omitted). The U.S. Supreme Court has explained that allowing patent claims for such purported inventions would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Id.* However, the U.S. Supreme Court has also cautioned that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 134 S. Ct. at 2354 (alteration, internal quotation marks, and citation omitted). Accordingly, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.*

United States District Court
Northern District of California

In *Alice*, the leading case on patent-eligible subject matter under § 101, the U.S. Supreme Court refined the "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" originally set forth in *Mayo*, 566 U.S. at 77. *Alice*, 134 S. Ct. at 2355. This analysis, generally known as the "*Alice*" framework, proceeds in two steps as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Id.* (alterations in original) (citations omitted); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (describing "the now familiar two-part test described by the [U.S.] Supreme Court in *Alice*").

### 2. *Alice* Step One—Identification of Claims Directed to an Abstract Idea

Neither the U.S. Supreme Court nor the Federal Circuit has set forth a bright-line test separating abstract ideas from concepts that are sufficiently concrete so as to require no further inquiry under the first step of the *Alice* framework. *See, e.g.*, *Alice*, 134 S. Ct. at 2357 (noting that "[the U.S. Supreme Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (observing that the U.S. Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in *Alice* (citation omitted)). As a result, in evaluating whether particular claims are directed to patent-ineligible abstract ideas, courts have generally begun by "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

Two of the U.S. Supreme Court's leading cases concerning the "abstract idea" exception involved claims held to be abstract because they were drawn to longstanding, fundamental

9

economic practices. *See Alice*, 134 S. Ct. at 2356 (claims "drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk" were directed to a patent-ineligible abstract idea); *Bilski*, 561 U.S. at 611-12 (claims drawn to "the basic concept of hedging, or protecting against risk" were directed to a patent-ineligible abstract idea because "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class" (citation omitted)).

Similarly, the U.S. Supreme Court has recognized that information itself is intangible. *See Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 451 n.12 (2007). Accordingly, the Federal Circuit has generally found claims abstract where they are directed to some combination of acquiring information, analyzing information, and/or displaying the results of that analysis. *See FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094-95 (Fed. Cir. 2016) (claims "directed to collecting and analyzing information to detect misuse and notifying a user when misuse is detected" were drawn to a patent-ineligible abstract idea); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (claims directed to an abstract idea because "[t]he advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions"); *In re TLI Commc'ns LLC*, 823 F.3d at 611 (claims were "directed to the abstract idea of classifying and storing digital images in an organized manner"); *see also Elec. Power Grp.*, 830 F.3d at 1353–54 (collecting cases).

However, the determination of whether other types of computer-implemented claims are abstract has proven more "elusive." *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015) ("[P]recision has been elusive in defining an all-purpose boundary between the abstract and the concrete[.]"). As a result, in addition to comparing claims to prior U.S. Supreme Court and Federal Circuit precedents, courts considering computer-implemented inventions have taken varied approaches to determining whether particular claims are directed to an abstract idea.

10

For example, courts have considered whether the claims "purport to improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, which may suggest that the claims are not abstract, or instead whether "computers are invoked merely as a tool" to carry out an abstract process, *Enfish*, 822 F.3d at 1336; *see also id.* at 1335 ("[S]ome improvements in computer-related technology when appropriately claimed are undoubtedly not abstract, such as a chip architecture, an LED display, and the like.  Nor do we think that claims directed to software, as opposed to hardware, are inherently abstract[.]").  The Federal Circuit has followed this approach to find claims patent-eligible in several cases.  *See Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017) (claims directed to an improved memory system were not abstract because they "focus[ed] on a 'specific asserted improvement in computer capabilities'—the use of programmable operational characteristics that are configurable based on the type of processor" (quoting *Enfish*, 822 F.3d at 1336)); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims directed to automating part of a preexisting method for 3-D facial expression animation were not abstract because they "focused on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type"); *Enfish*, 822 F.3d at 1335–36 (claims directed to a specific type of self-referential table in a computer database were not abstract because they focused "on the specific asserted improvement in computer capabilities (i.e., the self-referential table for a computer database)").

Similarly, the Federal Circuit has found that claims directed to a "new and useful technique" for performing a particular task were not abstract.  *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (holding that "claims directed to a new and useful technique for using sensors to more efficiently track an object on a moving platform" were not abstract); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048, 1050 (Fed. Cir. 2016) (holding that claims directed to "a new and useful laboratory technique for preserving hepatocytes," a type of liver cell, were not abstract); *see also Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (holding that claims for a method to cure rubber that employed a formula to calculate

Case No. 17-CV-04487-LHK
Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS

the optimal cure time were not abstract).

Another helpful tool used by courts in the abstract idea inquiry is consideration of whether the claims have an analogy to the brick-and-mortar world, such that they cover a "fundamental . . . practice long prevalent in our system." *Alice*, 134 S. Ct. at 2356; *see, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) (finding an email processing software program to be abstract through comparison to a "brick-and-mortar" post office); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D. Del. 2015) ("Another helpful way of assessing whether the claims of the patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by human beings in a non-computerized 'brick and mortar' context." (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014)).

Courts will also (or alternatively, as the facts require) consider a related question of whether the claims are, in essence, directed to a mental process or a process that could be done with pencil and paper. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1147 (Fed. Cir. 2016) (claims for translating a functional description of a logic circuit into a hardware component description of the logic circuit were patent-ineligible because the "method can be performed mentally or with pencil and paper"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) (claim for verifying the validity of a credit card transaction over the Internet was patent-ineligible because the "steps can be performed in the human mind, or by a human using a pen and paper"); *see also, e.g.*, *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims for computer-implemented system to enable borrowers to shop for loan packages anonymously were abstract where "[t]he series of steps covered by the asserted claims . . . could all be performed by humans without a computer").[2]

---

[2] One court has noted that, like all tools of analysis, the "pencil and paper" analogy must not be unthinkingly applied. *See Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) (viewing pencil-and-paper test as a "stand-in for another concern: that humans engaged in the same activity long before the invention of computers," and concluding that test was unhelpful where "error correction codes were not conventional activity that humans engaged in

12

United States District Court
Northern District of California

United States District Court
Northern District of California

Regardless of the particular analysis that is best suited to the specific facts at issue in a case, however, the Federal Circuit has emphasized that "the first step of the [*Alice*] inquiry is a meaningful one, i.e., . . . a substantial class of claims are *not* directed to a patent-ineligible concept." *Enfish*, 822 F.3d at 1335. The court's task is thus not to determine whether claims merely involve an abstract idea at some level, *see id.*, but rather to examine the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter," *Internet Patents*, 790 F.3d at 1346.

### 3. *Alice* Step Two—Evaluation of Abstract Claims for a Limiting Inventive Concept

A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations— considered individually or as an ordered combination—serve to "transform the claims into a patent-eligible application." *Content Extraction*, 776 F.3d at 1348. Thus, the second step of the *Alice* analysis (the search for an "inventive concept") asks whether the claim contains an element or combination of elements that "ensure[s] that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." 134 S. Ct. at 2355 (citation omitted).

The U.S. Supreme Court has made clear that transforming an abstract idea to a patent-eligible application of the idea requires more than simply reciting the idea followed by "apply it." *Id.* at 2357 (quoting *Mayo*, 566 U.S. at 72). In that regard, the Federal Circuit has repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347-48 (alteration in original) (quoting *Alice*, 134 S. Ct. at 2359); *see also Mortg. Grader*, 811 F.3d at 1324-25 (holding that "generic computer components such as an 'interface,' 'network,' and 'database' . . . do not satisfy the inventive concept requirement"); *Bancorp Servs.*, 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or

before computers").

13

computations could not.").

Likewise, "[i]t is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea" where those components simply perform their "well-understood, routine, conventional" functions. *In re TLI Commc'ns LLC*, 823 F.3d at 613 (citation omitted); *see also id.* (ruling that "telephone unit," "server," "image analysis unit," and "control unit" limitations were insufficient to satisfy *Alice* step two where claims were drawn to abstract idea of classifying and storing digital images in an organized manner). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Berkheimer*, 881 F.3d at 1368. This inquiry "goes beyond what was simply known in the prior art." *Id.* at 1369.

In addition, the U.S. Supreme Court explained in *Bilski* that "limiting an abstract idea to one field of use or adding token postsolution components [does] not make the concept patentable." 561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584 (1978)); *see also Alice*, 134 S. Ct. at 2358 (same). The Federal Circuit has similarly stated that attempts "to limit the use of the abstract idea to a particular technological environment" are insufficient to render an abstract idea patent-eligible. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (internal quotation marks and citation omitted); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.").

In keeping with these restrictions, the Federal Circuit has found that claims "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" can be sufficiently transformative to supply an inventive concept. *DDR*, 773 F.3d at 1257; *see also id.* at 1248, 1259 (concluding that claims that addressed the "Internet-centric problem" of third-party merchant advertisements that would "lure . . . visitor traffic away" from a host website amounted to an inventive concept).

United States District Court
Northern District of California

In addition, a "non-conventional and non-generic arrangement of known, conventional pieces" can amount to an inventive concept. *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). For example, in *BASCOM*, the Federal Circuit addressed a claim for Internet content filtering performed at "a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* Because this "specific location" was different from the location where Internet content filtering was traditionally performed, the Federal Circuit concluded this was a "non-conventional and non-generic arrangement of known, conventional pieces" that provided an inventive concept. *Id.* As another example, in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, the Federal Circuit held that claims relating to solutions for managing accounting and billing data over large, disparate networks recited an inventive concept because they contained "specific enhancing limitation[s] that necessarily incorporate[d] the invention's distributed architecture." 841 F.3d 1288, 1301 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 469 (Nov. 27, 2017). The use of a "distributed architecture," which stored accounting data information near the source of the information in the disparate networks, transformed the claims into patentable subject matter. *Id.*

### 4. Preemption

In addition to these principles, courts sometimes find it helpful to assess claims against the policy rationale for § 101. The U.S. Supreme Court has recognized that the "concern that undergirds [the] § 101 jurisprudence" is preemption. *Alice*, 134 S. Ct. at 2358. Thus, courts have readily concluded that a claim is not patent-eligible when the claim is so abstract that it preempts "use of [the claimed] approach in all fields" and "would effectively grant a monopoly over an abstract idea." *Bilski*, 561 U.S. at 612. However, the inverse is not true: "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *FairWarning*, 839 F.3d at 1098 (alteration in original) (citation omitted).

## III. DISCUSSION

Defendants' motions for judgment on the pleadings contend that the asserted claims of the

15

patents-in-suit fall within the patent-ineligible "abstract ideas" exception to § 101. The Court

applies the *Alice* framework described above to these claims. However, the Court need not

individually analyze every claim if certain claims are representative. *See generally Alice*, 134 S.

Ct. at 2359–60 (finding claims to be patent-ineligible based on analysis of one representative

claim). Here, the parties agree that claim 1 of the '863 Patent and claim 1 of the '070 Patent are

representative. Mot. at 16; Opp. at 5–6. Further, because these claims contain substantially

similar wording and have nearly identical specifications, the Court analyzes the claims together.

### A. *Alice* Step One

Step one of the *Alice* framework directs the Court to assess "whether the claims at issue are

directed to [an abstract idea]." *Alice*, 134 S. Ct. at 2355. The step one inquiry "applies a stage-

one filter to claims, considered in light of the specification, based on whether 'their character as a

whole is directed to excluded subject matter.'" *Enfish*, 822 F.3d at 1335 (citation omitted). Thus,

the Court conducts its step one inquiry by first identifying what the "character as a whole" of

claim 1 of the '863 Patent and claim 1 of the '070 Patent (collectively, "the claims") are "directed

to," and then discussing whether this is an abstract idea. In distilling the character of a claim, the

Court is careful not to express the claim's focus at an unduly "high level of abstraction . . .

untethered from the language of the claims," but rather at a level consonant with the level of

generality or abstraction expressed in the claims themselves. *Enfish*, 822 F.3d at 1337; *see also*

*Thales Visionix*, 850 F.3d at 1347 ("We must therefore ensure at step one that we articulate what

the claims are directed to with enough specificity to ensure the step one inquiry is meaningful.").

Defendants argue that the claims at issue are directed to "updating software stored on a

computer." Mot. at 9. Defendants further assert that "[c]ourts uniformly have found claims

directed to updating software stored on a computer to be abstract." *Id.*

MyMail counters that the claims "are directed to a process for the modification of toolbar

data over a network by adding a toolbar button or otherwise updating toolbar data without user

interaction." Opp. at 11. MyMail asserts that the claims cover "a specific improvement in the

16

United States District Court
Northern District of California

performance of a software tool—a toolbar on an end-user's device—by enabling toolbar data determining the specific information displayed by the toolbar to the user to be updated automatically without user intervention." *Id.* at 8. According to MyMail, this improvement provides "a solution to a problem in the software arts." *Id.* at 13.

Defendants reply that MyMail's characterization of the claims "is not meaningfully different" from Defendants' characterization, such that "[t]he claims are non-statutory no matter which characterization" is used. Reply at 2.

The Court finds that the claims are directed to a process for updating toolbar software over a network without user intervention. Specifically, the claims recite a process of (1) sending data from a toolbar database to a server; (2) analyzing the data to determine whether the toolbar needs to be updated; (3) if the toolbar needs to be updated, sending toolbar update data from the Internet; and (4) automatically updating the toolbar in accordance with the toolbar update data. *See* '863 patent at col. 29:28-63; '070 patent at col. 29:40-col. 30:20. Although the claims recite adding a button or changing at least one attribute of an existing button on the toolbar, the focus of the claims is on the process by which the toolbar is updated. Further, the specifications of both the '893 Patent and the '070 Patent, to the extent they describe toolbar updates, make no mention of adding or changing a button. Thus, updating toolbar software over a network without user intervention accurately captures what the "character as a whole" of the claims is "directed to." *Enfish*, 822 F.3d at 1335.

Based on comparisons of the claims at issue "to those claims already found to be directed to an abstract idea in previous cases," *Enfish*, 822 F.3d at 1334, this Court concludes that the claims at issue are directed to an abstract idea. First, the Court finds that the claims in the instant case are similar to claims that fall within the category of gathering and processing information, which the Federal Circuit has established is an abstract idea. Specifically, in *FairWarning IP, LLC v. Iatric Systems, Inc.*, the Federal Circuit considered a set of claims that recited a method of detecting fraud and misuse of personal health information that "collects information regarding

17

accesses of a patient's personal health information, analyzes the information according to one of several rules . . . to determine if the activity indicates improper access, and provides notification if it determines that improper access has occurred."  839 F.3d 1089, 1093 (Fed. Cir. 2016).

*FairWarning* concluded that the claims were directed to an abstract idea because they were "directed to a combination" of three "abstract-idea categories": (1) collecting information; (2) analyzing information; and (3) presenting the results of the collection and analysis of information. 839 F.3d at 1093–94.  Similarly, in *West View Research, LLC v. Audi AG*, 685 F. App'x 923, 926 (Fed. Cir. 2017) (unpublished), the Federal Circuit held that claims that "do not go beyond receiving or collecting data queries, analyzing the data query, retrieving and processing the information constituting a response to the initial data query, and generating a visual or audio response to the initial data query" were directed to the abstract idea of collecting, analyzing, and displaying information.

Like the claims in *FairWarning* and *West View Research*, the claims in the instant case recite a process comprised of transmitting data, analyzing data, and generating a response to transmitted data.  Specifically, the claims recite a process of receiving and analyzing data to determine whether a toolbar requires an update, and if so, sending updated toolbar data and updating the toolbar.  Thus, similar to the claims in *FairWarning* and *West View Research*, the claims at issue "do not go beyond receiving or collecting data queries, analyzing the data query, retrieving and processing the information constituting a response to the initial data query," and prompting a toolbar update in "response to the initial data query."  *West View Research*, 685 F. App'x at 926.  Further, this last step of initiating an update upon receipt of updated toolbar data is similar to "generating a visual or audio response to [a] . . . data query" in that both processes involve prompting some sort of generic function in response to a transmission of data.  *West View Research*, F. App'x at 926 (holding claim that included generating a visual or audio response to a data query is directed to the abstract idea of collecting, analyzing, and displaying information).

Second, the Court finds that the claims in the instant case are analogous to claims that have

been held by other district courts to be directed to an abstract idea because they relate to using communications networks to update software stored on computers. For example, in *White Knuckle Gaming, LLC v. Electronic Arts, Inc.*, 2016 WL 3129133 (D. Utah June 2, 2016), *aff'd*, 683 F. App'x 931 (Fed. Cir. 2017) (per curiam), the United States District Court for the District of Utah considered the patent-eligibility of claims directed to updating sports video game data stored on a computer via the Internet. Specifically, the claims at issue in *White Knuckle Gaming* were directed to a process that "allows a gaming company to update the software parameters of sports video games to reflect recent real-life occurrences"—including changes in "performance statistics, athletes' appearances, and uniform appearances"—by sending updated data from a data server to the video game console through the Internet. *Id.* at *1. The court concluded that those claims "recite[d] a simple internet-based method of updating the software of sports video games," and thus were directed to the abstract idea of "updating software in sports video games." *Id.* at *3. Further, the court noted that the updating process was "performed on a conventional computer, server, and network," and thus the claims disclosed only "conventional components performing basic, intended functions, in a routine, conventional manner." *Id.*

The claims in *White Knuckle Gaming* are analogous to the claims in the instant case. Specifically, the claims in both cases are directed toward updating data stored on a computer via the Internet. Although *White Knuckle Gaming* involved video game data, while this case concerns toolbar data, the two types of data are not materially different. That is, just as the video game data in *White Knuckle Gaming* determined the characteristics of the athletes in a video game, the toolbar data in the instant case determine the characteristics of toolbar buttons displayed on an Internet-connected device. Further, both sets of claims recite only conventional and generic components performing routine functions to carry out their respective updating process. Relatedly, as Defendants point out, "neither set of claims recites any software algorithms to accomplish the updating process." Reply at 8.

Similarly, in *Personalized Media Communications, LLC v. Amazon.com, Inc.*, 161 F. Supp.

United States District Court
Northern District of California

3d 325 (D. Del. 2015), *aff'd*, 671 F. App'x 777 (Fed. Cir. 2016) (per curiam), the United States

District Court for the District of Delaware addressed the patent-eligibility of, inter alia, claims

directed to a process for updating the operating system software stored on a remote computer via a

transmission network. Specifically, the claims at issue in *Personalized Media Communications*

recited an updating process comprised of (1) transmitting information about the specific version of

the operating system of a remote receiver station to a "signal detector"; (2) determining whether

the specific version matches a "designated version"; (3) if the specific version matches the

"designated version," sending updated operating system instructions to the remote receiver station,

erasing the remote receiver station's previous operating system instructions, and storing the

updated operating system instructions in the receiver station's memory. *Id.* at 331–32. The court

held that those claims were directed to "the abstract idea of updating operating instructions" and

remarked that the claims "seem[ed] quite generic" and "involve[d] only checking a receiver

station to see if it has the current operating instructions, and, if it does, not updating them." *Id.* at

332. The court also stated that "[o]ther than the fact that the method [disclosed by the claims] is

implemented on a computer, it is no different from checking to see if a copy of the Federal Rules

is up to date, and, if it is not, replacing it with a new one." *Id.*

The claims at issue in the instant case are very similar to the claims that were found to be

directed to an abstract idea in *Personalized Media*. Like the *Personalized Media* claims, the

claims in the instant case recite a process of updating software stored on a computer that is

comprised of transmitting information about the software, determining based on that information

whether the software needs to be updated, and if so, sending updated data to the device containing

the software and updating the software in accordance with the updated data. Thus, the claims in

the instant case also appear to be "no different from checking to see if a copy of the Federal Rules

is up to date, and, if it is not, replacing it with a new one." *Personalized Media*, 161 F. Supp. 3d at

332. Although MyMail insists that the claims in the instant case are distinguishable because they

describe an updating process that occurs "automatically without user intervention," MyMail's

United States District Court
Northern District of California

argument is unavailing. As the Federal Circuit has stated, "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017).

The claims in the instant case are also analogous to one set of claims considered in *Intellectual Ventures I, LLC v. Motorola Mobility LLC*, 81 F. Supp. 3d 356 (D. Del. 2015). In *Intellectual Ventures I*, the relevant claims, "[w]hen broken into their fundamental elements," recited: "(1) presenting a directory of software updates at [a] user station; (2) selecting and transmitting the desired software updates; and (3) receiving the requested software updates." *Id.* at 365–66. The court in *Intellectual Ventures I* noted that those claims "generically recite[d] the steps of 'presenting,' 'sending,' and 'receiving,' with no description of the underlying programming." *Id.* at 366. The court also stated that "the limitations provided by the dependent claims—that the software updates be 'automatically installed on the user station' over 'the Internet'—do not make the claimed invention any less abstract." *Id.* Based on this analysis, the court concluded that "the claims [were] directed to the abstract idea of distributing software updates to a computer." *Id.*

The same is true of the claims at issue in the instant case. Specifically, like in *Intellectual Ventures I*, the focus of the instant claims is on distributing updated software to a computer through the Internet. Further, as in *Intellectual Ventures I*, the instant claims also "generically recite the steps of" "displaying," "sending," "determining," "receiving," and "initiating" an update "with no description of the underlying programming." *Id.* Finally, although the limitations in the instant claims specify that the toolbar updates and modifications will be done "without user interaction" and "dynamically," as the *Intellectual Ventures I* court stated, these limitations "do not make the claimed invention any less abstract." *Id.*

Accordingly, the Court finds that the claims at issue in the instant case are directed to an abstract idea. The Court next analyzes *Alice* step two.

**B. *Alice* Step Two**

"In step two of the *Alice* inquiry, [the Court] search[es] for an 'inventive concept sufficient to transform the nature of the claim into a patent-eligible application.'" *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) (quoting *McRO*, 837 F.3d at 1312 (internal quotation marks omitted)). "To save the patent at step two, an inventive concept must be evident in the claims." *Id.* This inventive concept "must be significantly more than the abstract idea itself," *BASCOM*, 827 F.3d at 1349, "must be more than well-understood, routine, conventional activity," *Affinity Labs of Texas, LLC v. DIRECTV*, 838 F.3d 1253, 1262 (Fed. Cir. 2016), "and cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM*, 827 F.3d at 1349. For example, it may be found in an "inventive set of components or methods," "inventive programming," or an inventive approach in "how the desired result is achieved." *Elec. Power Grp.*, 830 F.3d at 1355.

The Court finds that none of the elements of the claims at issue, assessed individually, provide an inventive concept. All of the hardware components recited in the claims are generic, conventional components. The claims recite a "user Internet device" and a server, and the specifications refer only to generic Internet-connected computers and servers. Additionally, the claims recite a "toolbar" with "one or more buttons," but the specifications confirm that toolbars were already in widespread use. *See* '863 patent at col. 10:8-13 ("All functions may be initiated through the human interface—a Toolbar (also described in the art as a button bar and basic examples of which may be found in many present day computer applications)."). Moreover, the claims call on these conventional components to perform their routine functions, including "displaying" a toolbar, "sending" and "receiving" information, "determining" something based on that information, and "initiating . . . an operation to update" the toolbar software. No language in the claims or the specifications "demonstrat[es] that the generic computer components function in an unconventional manner or employ sufficiently specific programming." *Intellectually Ventures I*, 81 F. Supp. 3d at 367. Instead, the functions recited by the claims at issue—that is, "displaying," "sending," "receiving," "determining," and "initiating"—are "specified at a high

level of generality," which the Federal Circuit has found to be "insufficient to supply an inventive concept." *Ultramercial*, 772 F.3d at 716.

In its opposition, MyMail relies on the fact that the claims specify that "updating" the toolbar is comprised of either (1) adding a button to the toolbar; or (2) updating at least one attribute of an existing button. Opp. at 19. However, no language from either the claims or the specifications suggests that adding a button or changing an existing button is anything beyond a "routine and conventional" result of a toolbar update. *DDR*, 773 F.3d at 1258–59. On the contrary, this claim limitation does nothing more than recite the expected results of any toolbar update. Nor is there any indication that adding or changing a button is an inventive or non-conventional way of achieving the "desired result" of updating a toolbar, or that it involves "inventive programming." *Elec. Power Grp.*, 830 F.3d at 1355. Indeed, the claims clearly state that a toolbar's attributes are defined "by toolbar data stored in one or more toolbar-defining databases," and that updating the toolbar (and thereby adding a button or changing an existing button) is done simply by updating the data in the toolbar-defining databases. '863 patent at col. 29:28-63; '070 patent at col. 29:40-30:20. As Defendants point out, "[t]here is nothing particularized or non-conventional about modifying a software system either by adding to or updating data in a database." Reply at 5.

The Court also finds that the ordered combination of the elements in the claims at issue does not yield an inventive concept. MyMail seeks to invoke *DDR*, in which the Federal Circuit found that the challenged patent was valid because it "specif[ied] how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." 773 F.3d at 1258–59. However, the claims at issue do not recite a process for updating software that deviates from the "routine and conventional" updating process. *Id.* On the contrary, the claims disclose the conventional and commonsensical steps of checking toolbar data to determine whether the toolbar needs an update, and if so, updating the toolbar. Thus, much like the claims in *Intellectual*

*Ventures I*, "instead of overriding a routine sequence of events," the instant claims apply generic components performing their routine functions "to automate the delivery of software updates." 81 F. Supp. 3d at 367. The specifications further confirm this conclusion because nothing in the specifications remotely suggests that the claims in the instant case produce a result that "overrides the routine and conventional sequence of events" for updating software on a computer. 773 F.3d at 1258–59. Finally, although the claims recite that certain steps are done "automatically" and "dynamically," "not every invention that automates a process . . . is patentable." *Procter & Gamble Co. v. Quantificare, Inc.*, 2017 WL 6497629, *14 (N.D. Cal. Dec. 19, 2017). Indeed, "[a] general purpose computer with minimal programming can perform functions 'automatically' and 'dynamically,' and implementation of an abstract idea on such a computer is not an inventive concept." *Clear with Computers, LLC v. Altec Industries, Inc.*, 2015 WL 993392, *4 (E.D. Tex. Mar. 3, 2015). Accordingly, the Court finds that nothing in the ordered combination of elements recited in the claims at issue bring them outside the realm of the abstract idea of updating toolbar software over a network without user intervention.

Because the Court finds at *Alice* step one that the claims in the instant case are directed to an abstract idea and at step two that there is no inventive concept sufficient to save the claims, the Court concludes that the asserted claims are patent-ineligible under § 101. Defendants' motions for judgment on the pleadings are therefore GRANTED.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motions for judgment on the pleadings.

**IT IS SO ORDERED.**

Dated: March 16, 2018

*Lucy H. Koh*
LUCY H. KOH
United States District Judge

24