1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MYMAIL, LTD., <br><br>     Plaintiff, <br><br>    v. <br><br> IAC SEARCH & MEDIA, INC., et al., <br><br>     Defendants. | Case No. 17-CV-04488-LHK <br><br> **ORDER CONSTRUING CLAIM TERM OF U.S. PATENT NOS. 8,275,863 AND 9,021,070** <br><br> Re: Dkt. No. 140 |

Plaintiff MyMail, Ltd. ("MyMail" or "Plaintiff") brings this action for patent infringement against Defendants ooVoo, LLC ("ooVoo") and IAC Search & Media, Inc. ("IAC") (collectively, "Defendants"). The parties now seek construction of a single disputed term, "toolbar," used in the claims of the following patents-in-suit: U.S. Patent Nos. 8,275,863 ("'863 patent") and 9,021,070 ("'070 patent") (collectively, "MyMail patents" or "the patents"). *See* ECF Nos. 140, 143, 144.[1] Having considered the parties' submissions, the relevant law, and the record in this case, the Court

---

[1] On January 8, 2020 the Court consolidated Case Nos. 17-CV-4487 and 17-CV-4488 and designated Case No. 17-CV-04488 as the lead case. ECF No. 139 at 2. "ECF No." refers to docket entries in Case No. 17-CV-4488. *Id*. "ooVoo ECF No." denotes docket entries in Case No. 17-CV-4487 that were filed prior to consolidation and were not spread over to the docket in Case No. 17-CV-4488.

construes "toolbar" from the '863 patent and '070 patent as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script."

## I. BACKGROUND

### A. Factual Background

#### 1. The Parties

Plaintiff MyMail is a "Texas Limited Partnership" with a primary place of business in Athens, Texas. ooVoo ECF No. 1 ¶ 1. MyMail is the assignee of the '863 and '070 patents. *Id.* ¶ 9. Defendant ooVoo is a Delaware corporation with its primary place of business in New York, New York. *Id.* ¶ 2. Defendant IAC is Delaware corporation with its primary place of business in Oakland, California. ECF No. 1 ¶ 2.

#### 2. The Patents

The '863 patent is titled "Method of Modifying a Toolbar." ECF No. 143-1 ('863 patent). It was filed on April 16, 2003 and issued on September 25, 2012. The '070 patent is titled "Dynamically Modifying a Toolbar." ECF No. 143-2 ('070 patent). It was filed on June 20, 2013 and issued on April 28, 2015. The two patents are related. Specifically, the '070 patent is a continuation of U.S. Application No. 13/573,311, which in turn is a continuation application of the '863 patent. Thus, the '863 patent and the '070 patent share similar claims, identical figures, and nearly identical specifications.

The patents state that they relate "in general to digital data networks and, more particularly, to network access and to minimizing unauthorized interception of data and denial of network services." '863 Patent col. 1:26-29. However, the patents also describe a method for updating toolbars or "button bars" that are displayed on Internet-connected devices such as personal computers. *Id.* at col. 10:7-11:16. Specifically, the patents disclose a toolbar database that stores data defining the attributes of the toolbar, like button captions and button functionality. *Id.* at col. 10:38-11:4. When the device that displays the toolbar is connected to the internet, the device executes software called a "client dispatch application" that initiates a "pinger" to update the toolbar database, along with other databases. *Id.* at col. 11:44-47, col. 12:16-17, col. 17:30-32.

2

United States District Court
Northern District of California

The pinger sends information about those databases to a network server, which in turn uses the sent information to determine whether any of the databases require updates. *Id.* at col. 11:47-52, col. 12:17-24, col. 17:32-40. If any updates are required, the server sends those updates to the device. *Id.* at col. 17:40-66.

MyMail asserts claims 1-5, 9-13, 16-17, 19-20, and 23 of the '863 patent and claims 1-13 and 15-22 of the '070 patent. ECF No. 109 at 5.

## B. Procedural History

On November 18, 2016, MyMail filed its complaint for patent infringement against Defendant ooVoo in the United States District Court for the Eastern District of Texas. *See* ooVoo ECF No. 1. Then, on December 20, 2016, MyMail filed its complaint for patent infringement against Defendant IAC in the same court. *See* ECF No. 1.

On February 2, 2017, ooVoo moved to dismiss MyMail's action for improper venue, answered MyMail's complaint, and asserted counterclaims against MyMail. ooVoo ECF Nos. 18, 19. On February 3, 2017, MyMail opposed ooVoo's motion to dismiss for improper venue. ooVoo ECF No. 24.

Similarly, on February 13, 2017, IAC moved to dismiss MyMail's action for improper venue, answered MyMail's complaint, and asserted counterclaims against MyMail. ECF Nos. 16, 17. On that same day, MyMail opposed IAC's motion to dismiss for improper venue. ECF No. 20.

On February 23, 2017, MyMail answered ooVoo's counterclaims. ooVoo ECF No. 27. On March 6, 2017, MyMail answered IAC's counterclaims. ECF No. 27.

On July 11, 2017, the United States District Court for the Eastern District of Texas transferred both of MyMail's actions to this district. ooVoo ECF No. 33; ECF No. 70. MyMail's action against ooVoo was originally assigned to United States Magistrate Judge Susan van Keulen, *see* ooVoo ECF No. 35, and MyMail's action against IAC was originally assigned to United States Magistrate Judge Joseph Spero. *See* ECF No. 72. However, MyMail declined Magistrate Judge jurisdiction in both actions. ooVoo ECF No. 36; ECF No. 74. Thus, on

Case No. 17-CV-04488-LHK
ORDER CONSTRUING CLAIM TERM OF U.S. PATENT NOS. 8,275,863 AND 9,021,070

September 1, 2017, MyMail's action against ooVoo was reassigned to the undersigned judge, ooVoo ECF No. 38, and MyMail's action against IAC was reassigned to United States District Judge Phyllis J. Hamilton, ECF No. 77.

On October 2, 2017, MyMail filed a motion to relate MyMail's action against IAC to MyMail's action against ooVoo. ooVoo ECF No. 48. On October 10, 2017, the Court granted MyMail's motion to relate. ooVoo ECF No. 55. As a result, MyMail's action against IAC was reassigned to the undersigned judge. ECF No. 93.

On October 31, 2017, Defendants filed motions for judgment on the pleadings, seeking to invalidate MyMail's patents under 35 U.S.C. § 101. ooVoo ECF No. 62; ECF No. 101. On March 16, 2018, the Court granted Defendants' motion for judgment on the pleadings, invalidating MyMail's patents under 35 U.S.C. § 101. ooVoo ECF No. 90; ECF No. 129. On March 26, 2018, MyMail filed a notice of appeal to the Federal Circuit Court of Appeals. ooVoo ECF No. 92; ECF No. 131.

On August 16, 2019, a divided panel of the Federal Circuit Court of Appeals vacated and remanded the Court's order granting Defendants' motion for judgment on the pleadings because the Court did not construe the term "toolbar" before issuing the order. *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1380 (Fed. Cir. 2019). On October 1, 2019, Defendants filed renewed motions for judgment on the pleadings and again sought to invalidate the patents under 35 U.S.C. § 101. ooVoo ECF No. 98; ECF No. 133.

However, on January 8, 2020, at a case management conference, the parties agreed that the Court should first construe the term "toolbar" before addressing Defendants' renewed motions. ECF No. 139. Accordingly, the Court denied without prejudice Defendants' renewed motions for judgment on the pleadings. The Court also consolidated the cases under Case No. 17-CV-04488. *Id.*

On January 14, 2020, in response to the Court's case management order, MyMail filed its Opening Brief on Claim Construction. ECF No. 140 ("Opening Br."). On January 21, 2020, Defendants' filed its Responsive Claim Construction Brief. ECF No. 143 ("Resp. Br."). On

January 23, 2020, MyMail filed its Reply. ECF No. 144 ("Reply").

## II.    LEGAL STANDARD

The Court construes patent claims as a matter of law based on the relevant intrinsic and extrinsic evidence. *See Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272 (Fed. Cir. 2014) (en banc); *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips*, 415 F.3d at 1316 (internal quotation marks and citation omitted). Accordingly, a claim should be construed in a manner that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Id.*

In construing claim terms, a court looks first to the claims themselves, for "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Generally, the words of a claim should be given their "ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13. In some instances, the ordinary meaning to a person of skill in the art is clear, and claim construction may involve "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

In many cases, however, the meaning of a term to a person skilled in the art will not be readily apparent, and a court must look to other sources to determine the term's meaning. *See id.* Under these circumstances, a court should consider the context in which the term is used in an asserted claim or in related claims and bear in mind that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification "'is always highly relevant'" and "'[u]sually . . . dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic,*

United States District Court
Northern District of California

*Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Indeed, "the only meaning that matters in claim construction is the meaning in the context of the patent." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). Where the specification reveals that the patentee has given a special definition to a claim term that differs from the meaning it would ordinarily possess, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. Likewise, where the specification reveals an intentional disclaimer or disavowal of claim scope by the inventor, the inventor's intention as revealed through the specification is dispositive. *Id.* Finally, though the specification may describe a preferred embodiment, the claims are not necessarily limited only to that embodiment. *Id.* at 1323; *see also Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1151 (Fed. Cir. 2003) ("The general rule, of course, is that claims of a patent are not limited to the preferred embodiment, unless by their own language.").

In addition to the specification, a court may also consider the patent's prosecution history, which consists of the complete record of proceedings before the United States Patent and Trademark Office ("USPTO") and includes the cited prior art references. The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

A court is also authorized to consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Expert testimony may be particularly useful in "[providing] background on the technology at issue, . . . explain[ing] how an invention works, . . . ensur[ing] that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or . . . establish[ing] that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. However, although a court may consider evidence extrinsic to the patent and prosecution history, such evidence is considered "less significant than the intrinsic

record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1317-18 (internal quotation marks and citations omitted). Thus, while extrinsic evidence may be useful in claim construction, ultimately "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. Any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history" will be significantly discounted. *Id.* at 1318 (internal quotation marks and citation omitted).

## III.    DISCUSSION

The parties dispute a single term, "toolbar," which is found in both the '863 and '070 patents. The parties' proposed constructions are as follows:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a button bar that can be generated, dynamically changed, or updated via a Pinger process or a MOT script" | "an arrangement of user controls to activate functions in an application" |

The term "toolbar" appears in multiple claims of the '863 and '070 patents, and MyMail previously identified claim 1 of both patents as representative. *See* ECF No. 109 at 5. For example, claim 1 of the '863 patent recites:

> 1. A method of modifying a **toolbar**, comprising the steps of:
>
> a user Internet device displaying a **toolbar** comprising one or more buttons, the **toolbar** defined by **toolbar** data stored in one or more **toolbar**-defining databases, the **toolbar** data comprising a plurality of attributes, each attribute associated with a button of the **toolbar**, wherein for each button of the **toolbar**, at least one of the plurality of attributes identifying a function to be performed when the button is actuated by the user Internet device;
>
> the user Internet device automatically sending a revision level of the one or more **toolbar**-defining databases to a predetermined network address;
>
> a server at the predetermined network address determining, from the revision level, the user Internet device should receive the **toolbar** update data;
>
> the user Internet device receiving **toolbar** update data from the Internet;
>
> the user Internet device initiating without user interaction an operation to

United States District Court
Northern District of California

update the **toolbar** data in accordance with the **toolbar** update data received;

the user Internet device updating, by the operation, the **toolbar** data in accordance with the **toolbar** update data, thereby producing updated **toolbar** data, the updating comprising at least one of the following steps (a) and (b), each respectively comprising:

(a) writing at least one new attribute to the original **toolbar** data, wherein the writing at least one new attribute to the **toolbar** data comprises changing the one or more buttons of the **toolbar** by adding a button; and

(b) updating at least one attribute of the **toolbar** data; and

the user Internet device displaying the **toolbar** as defined by the updated **toolbar** data.

'863 Patent col. 29:28-63 (emphasis added). Similarly, claim 1 of the '070 patent recites:

1. A method for dynamically modifying a **toolbar**, the method comprising:

displaying the **toolbar**, at a user Internet device, that includes one or more **toolbar** buttons, the **toolbar** defined by **toolbar** data stored in one or more **toolbar**-defining databases, the **toolbar** data comprising a plurality of **toolbar** button attributes associated with the one or more **toolbar** buttons of the **toolbar**, wherein at least one of the plurality of **toolbar** button attributes identifies a function to be performed by a specific **toolbar** button upon actuation of the specific **toolbar** button;

invoking, from the user Internet device without user intervention, communication of information associated with the one or more **toolbar**-defining databases to a server associated with a network address;

receiving, at the server, the information associated with the one or more **toolbar**-defining databases;

determining, based on the information associated with the one or more **toolbar**-defining databases, that the user Internet device should receive updated **toolbar** data;

receiving, at the user Internet device, the updated **toolbar** data in response to determining that the user Internet device should receive the updated **toolbar** data;

initiating, at the user Internet device and without user interaction, an operation to update the **toolbar** data in accordance with the received updated **toolbar** data;

updating the **toolbar** data at the user Internet device based on the operation and in accordance with the updated **toolbar** data, thereby updating the **toolbar** data, the updating comprising at least one member of a group comprising (a) and (b):

(a) updating the **toolbar** data to include at least one new attribute of the **toolbar** data to change the **toolbar** by adding a **toolbar** button to the **toolbar**; and

(b) updating the **toolbar** data to modify an attribute of at least one of the one or more **toolbar** buttons of the **toolbar**;

and displaying at the user Internet device the **toolbar** as defined by the updated **toolbar** data,

wherein the information associated with the **toolbar** data includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number.

'070 Patent col. 29:40-30:20 (emphasis added).

MyMail argues that "toolbar" should be construed as "a button bar that can be generated, dynamically changed, or updated via a Pinger process or a MOT script." Opening Br. at 2. Defendants argue that the claim term should be construed to mean "an arrangement of user controls to activate functions in an application." Resp. Br. at 1.

As an initial matter, neither party's construction appears in the claim language of either the '863 or '070 patents. Instead, MyMail relies on language in the patents' specifications, and Defendants rely on an Information Disclosure Statement ("IDS") that MyMail submitted to the USPTO during patent prosecution. *See* Opening Br. at 3-5; Resp. Br. at 4-5. Both a patent's prosecution history and a patent's specification constitute "intrinsic evidence," and the Court can rely on both "for guidance as to the meaning of the claims." *Phillips*, 415 F.3d at 1316-17.

Furthermore, the Court notes that a United States District Judge in the Eastern District of Texas and the Patent Trial and Appeal Board ("PTAB") in three inter partes review proceedings ("IPR") have already construed the term "toolbar" in the '863 and '070 patents. All four decisions adopt constructions largely similar to what MyMail proposes. *See MyMail, Ltd. v. Yahoo! Inc.*,

2017 WL 3978190 (E.D. Tex. Sept. 9, 2017); ECF No. 140-2 ("IPR2018-00117") (denying institution of IPR for the '070 patent); ECF No. 140-3 ("IPR2018-00118") (denying institution of IPR for the '863 patent); and ECF No. 140-4 ("IPR2017-00967") (final written decision upholding validity of the '863 patent). Although these decisions are not binding, the Court nonetheless recognizes these prior constructions as persuasive authority. *See MedImmune, LLC v. PDL BioPharma, Inc.*, 2009 WL 1011519, at *10 (N.D. Cal. Apr. 14, 2009) (according "deference to [a] prior claim construction ruling [from a different district court] as persuasive authority" (citing *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993))).

Below, the Court discusses the MyMail patents' specifications and then Defendants' prosecution history arguments. For the reasons discussed below, the Court generally adopts MyMail's proposed construction but modifies this construction by omitting the word "generated" and omitting a comma. Thus, the Court construes "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script." The Court notes that this construction is functionally identical to the one adopted by the United States District Court for the Eastern District of Texas in *Yahoo!*, 2017 WL 3978190. Specifically, the Court's construction begins "*a* button bar" while the *Yahoo!* court's construction begins with "button bar." Otherwise, the *Yahoo!* court's construction is identical to the Court's construction.

### A. Specifications

At the outset, the Court notes that the parties disagree as to whether the specifications of the '863 and '070 patents provide a definition for "toolbar" or whether construing "toolbar" using this definition would improperly import limitations from the specifications. *See* Opening Br. at 3-5; Resp. Br. at 5-8. The specifications of both the '863 and '070 patents state that "[t]he Toolbar of the present invention has some unique properties as it can be dynamically changed or updated via a Pinger process or a MOT script." '863 Patent col. 10:15-17; '070 Patent col. 10:24-26. MyMail argues that the Court should construe "toolbar" as "consistent with this language." Opening Br. at 5. MyMail further argues that a "person of skill in the art would recognize the toolbars claimed in the MyMail patents to be distinguishable from other toolbars on th[e] basis [of

Case No. 17-CV-04488-LHK
ORDER CONSTRUING CLAIM TERM OF U.S. PATENT NOS. 8,275,863 AND 9,021,070

being able to be modified by Pinger or MOT scripts]." *Id.* at 4.

Defendants respond that MyMail's construction improperly imports a limitation from the specifications and that "the specification excerpts on which MyMail relies do not clearly or unmistakably establish a unique definition for 'toolbar.'" Resp. Br. at 6. Furthermore, Defendants argue that "MyMail's proposed construction . . . would have no practical limiting effect on the claims," which Defendants contend weighs against MyMail's construction. *Id.* at 7-8. Lastly, Defendants argue that MyMail's construction will confuse the jury because "the specifications confirm that the term 'toolbar' is familiar to ordinary users. . . . [and] MyMail's proposal . . . injects uncertainty into an ordinary term that is familiar to a jury." *Id.* at 8.

The Court finds that the language in the patents' specifications supports construing "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script." Specifically, the Court concludes that the language in the patents' specifications is definitional and that adopting this definition does not improperly import a limitation from the specifications. As such, the Court will first address why the specifications support the Court's construction before turning to Defendants' remaining arguments that this construction will not limit the claims and will confuse a jury.

"There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). Ordinarily, limitations set forth in a preferred embodiment disclosed in a specification do not limit the scope of the claim. *See, e.g., Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908 (Fed. Cir. 2004) (rejecting treating a passage in a patent's specification as limiting where "the quoted passage does not suggest that [the feature] is an essential component of the invention").

Nonetheless, "a patentee's consistent reference [in the specification] to a certain limitation or a preferred embodiment as 'this invention' or the 'present invention' can serve to limit the scope of the entire invention, particularly where no other intrinsic evidence suggests others." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011); *see also On*

United States District Court
Northern District of California

*Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope").  As such, if a patent's specification consistently describes or uses a term in a specific manner, while simultaneously highlighting that description or use as a characteristic of the "present invention," the specification can be definitional.

Here, the patents' specifications support treating the specifications as definitional and construing a "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script" for two reasons.  First, the specifications explicitly state that the "Toolbar *of the present invention*" has the "unique propert[y]" of being capable of being "dynamically changed or updated via a Pinger process or a MOT script."  Second, in every embodiment in the MyMail patents, the "toolbar" consistently has this capability and is consistently described in conjunction with dynamically changing or updating via a Pinger process or a MOT script.

### 1.  The Specifications' Use of "The Present Invention" is Definitional

First, the patents' specifications use the language "of the present invention" when describing the capabilities of the "toolbar."  Specifically, the specifications state that "[t]he Toolbar of the *present invention* has some unique properties as it can be *dynamically changed or updated via a Pinger process or a MOT script*."  '863 Patent col. 10:15-17 (emphasis added); *see also* '070 Patent col. 10:24-26 (using identical language).  As stated above, the Federal Circuit has held that "a patentee's consistent reference to a certain limitation . . . as '*this invention*' or the '*present invention*' can serve to limit the [patent's] scope."  *Absolute*, 659 F.3d at 1136 (emphasis added); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").  Here, neither specification gives an alternative definition or description of the "toolbar," nor do the specifications describe the "present invention" in a different way.  Thus, the specifications provide no language elsewhere that might undermine

this description of "toolbar."  As such, because the '863 and '070 patents' specifications provide the capability of being "dynamically changed or updated via a Pinger process or a MOT script" when describing the "Toolbar of *the present invention*," the Court finds that such language weighs in favor of treating the description in the specifications as definitional and construing "toolbar" as consistent with this description.

### 2. The Toolbar Consistently Has The Capability of Being Dynamically Changed or Updated by a Pinger Process or a MOT Script

Second, every embodiment of the "toolbar" disclosed in the specifications has the capability of being dynamically changed or updated by a Pinger process or a MOT script. Specifically, the term "toolbar" appears in two places in the patents' specifications: (1) in a section spanning columns 10 and 11, and (2) in the specifications' description of Figure 16.  *See* '863 Patent col. 10:7-11:4, 26:55-27:3 (describing Figure 16); '070 Patent col. 10:16-11:12, 26:66-27:14 (describing Figure 16).  In both instances, the "toolbar" has the ability to be dynamically changed or updated by a Pinger process or a MOT script.

In the first occurrence of the term "toolbar," in columns 10-11, the '863 patent describes the "toolbar" in conjunction with dynamically changing or updating via a Pinger process or a MOT script.  This section, in relevant part, states:

> The button bar database 208 includes information related to button bar creation and modification. All functions may be initiated through the human interface— a Toolbar (also described in the art as a button bar and basic examples of which may be found in many present day computer applications).  Software responsive to the button bar database 208, for displaying the Toolbar in accordance with data in the button bar database 208, may be provided as part of a network browser.  ***The Toolbar of the present invention has some unique properties as it can be dynamically changed or updated via a Pinger process or a MOT script.***  As defined in this application and as will be described in more detail later, a ***Pinger process*** comprises an entity that acts transparently as a "services" coordinator to provide and/or administer the following:
>
> 1. Heartbeat service to help maintain network connectivity with a client.
> 2. Authentication services that securely authenticate client access to email, commerce, and other public and private network servers and services.
> 3. ***Update services*** that can perform client software, database, and maintenance services during periods of inactivity.

Case No. 17-CV-04488-LHK
ORDER CONSTRUING CLAIM TERM OF U.S. PATENT NOS. 8,275,863 AND 9,021,070

*The Pinger entity, as suggested above, has, as one of its functions, the responsibility of providing database updates* to the client user. *When a MOT script is used, it can be a "mime type" definition part of an E-mail message, an HTTP web document download and so forth, which transparently automates the Toolbar update.* The Toolbar can be integrated with ticker tape which can spawn MOT scripts, URLs, or execute programs.

'863 Patent col. 10:7-38 (emphasis added); *see also* '070 Patent col. 10:16-46 (using identical language).

Likewise, where the patents' specifications describe Figure 16, the specifications explain that the "toolbar" is consistent with the capability of being dynamically updated by a Pinger process or a MOT script. *See* '863 Patent col. 26:55-27:3 (describing Figure 16); '070 Patent col. 26:66-27:14 (same). There, the specifications describe a "tool bar" and how to incorporate data to update information in the toolbar. *See id.* The patents' specifications describe Figure 16 as follows:

> FIG. 16 provides a simplified example of a button bar, power bar, or *tool bar* that can be generated using the referenced MOT script language in combination with data retrieved from the data bases. If a client were traveling away from home and accessed the network from New York, *this information would be provided to the pinger entity*. If the client then logged onto a web page of an airline who was also a client of a service using the present inventive components, the web page could be programmed, since data would be available that the clients home [sic] was for example Dallas Tex., *to immediately bring up* a list of all flights leaving New York and bound for other destinations that the client had regularly traveled to in the recent past such as Dallas. The MOT generated bar or graphic in one implementation including a moving display. Such a display may provide advertising or information like ticker tape like stock market data.

'863 Patent col. 26:55-27:3 (emphasis added); '070 Patent col. 26:66-27:14 (using identical language but slightly changing punctuation).

As such, in every embodiment and disclosure of "toolbar," the "toolbar" can be dynamically changed or updated via a Pinger process or a MOT script. Indeed, Defendants fail to point to any instance in the specifications where the patents disclose a toolbar that cannot be or is not dynamically changed or updated in this manner. *See* Resp. Br. at 5-6. The Federal Circuit has held that such consistency in a specifications' embodiments and disclosures weigh in favor of

treating the specifications as definitional and limiting the scope of a term. *See, e.g., In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012) (holding that the conclusion that the claimed electrochemical sensor could not have external wires was supported by, among other considerations, the fact that "every embodiment disclosed in the specification shows . . . [a] sensor without external cables or wires"); *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (construing a term as limited to a specific feature because, in part, "[e]very embodiment described in the specification has [the feature]"). Therefore, the Court finds that the specifications' consistent disclosure of a toolbar capable of being "dynamically changed or updated via a Pinger process of a MOT script" weighs in favor of treating the specifications' description of "toolbar" as definitional.

As such, because the patents explicitly disclose that the "Toolbar of the *present invention*" has the "unique propert[y]" of being capable of being dynamically changed or updated by a Pinger process or a MOT script, and because every disclosure of "toolbar" has this capability, the Court finds that the specifications' description is definitional and that the Court's construction does not improperly import limitations from the specification.

### 3. *Yahoo!* Court's Construction and the PTAB's Construction Support the Court's Construction

The Court's construction accords with the claim constructions of the same "toolbar" term in MyMail's '863 and '070 patents by the United States District Court for the Eastern District of Texas and the PTAB. *See Yahoo! Inc.*, 2017 WL 3978190, at *7-8; IPR2018-00117 at 9-13; IPR2018-00118 at 9-13; IPR2017-00967 at 8-11. The various "toolbar" constructions are as follows:

| Proceeding | Construction of "toolbar" |
|---|---|
| This Court's Construction | "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script" |
| The United States District Court for the Eastern District of Texas in *MyMail, Ltd. v. Yahoo! Inc.*, 2017 WL 3978190 (E.D. Tex. Sept. 9, 2017) | "button bar that can be dynamically changed or updated via a Pinger process or a MOT script" |

Case No. 17-CV-04488-LHK
ORDER CONSTRUING CLAIM TERM OF U.S. PATENT NOS. 8,275,863 AND 9,021,070

| The PTAB in IPR2017-00967, IPR2018-00117, and IPR2018-00118 | "a button bar that can be generated, dynamically changed, or dynamically updated via a Pinger process or a MOT script" |
| --- | --- |

In *Yahoo!*, the United States District Court for the Eastern District of Texas concluded that "in the description of the exemplary embodiments, the toolbar always has this ability [to be dynamically changed or updated via a Pinger process or a MOT script]. *This is definitional*." 2017 WL 3978190, at *7 (emphasis added). As such, the *Yahoo!* court's construction of "toolbar" is substantively identically to the Court's construction, with the only difference being this Court's addition of "a" before toolbar. *See id.* The Court adopts a construction with "a" because that patents' specifications describe the "toolbar" as "a button bar," rather than merely "button bar." '863 Patent col. 10:10; '070 Patent col. 10:19

Likewise, in the final written decision of IPR2017-00967, the PTAB reached a largely similar conclusion and found that the specifications' description of "toolbar" was definitional. The PTAB stated:

> Because the '863 patent discloses that a toolbar is necessarily generated and updated based on button bar database 208 and updates thereto, we determine that the disclosed toolbar is generated or updated via a Pinger process or MOT script. As such, we further determine that the '863 patent defines "toolbar" as a button bar that can be generated, dynamically changed, or dynamically updated via a Pinger process or a MOT script. This construction is consistent with our determinations in the [two PTAB decisions denying institution of IPR].

IPR2017-00967 at 10. The remaining two PTAB decisions—both denying institution of IPR—adopted the same construction as in IPR2017-00967. *See* IPR2018-00117 at 11-13 (construing "toolbar" as "a button bar that can be generated, dynamically changed, or dynamically updated via a Pinger process or a MOT script"); IPR2018-00118 at 11-13 (same).

However, the Court notes that although the PTAB adopted a construction similar to that in *Yahoo!*, the PTAB modified this construction by adding that the "toolbar" "can be generated" by a Pinger process or MOT script, rather than only dynamically changed or updated. *Compare id.* (adopting the construction "a button bar that can be *generated*, dynamically changed, or dynamically updated . . .") *with Yahoo!*, 2017 WL 3978190, at *7 (adopting the construction "button bar that can be dynamically changed or updated"). The PTAB stated that it adopted this

16

United States District Court
Northern District of California

additional language in its construction because "each embodiment disclosing a toolbar . . . is accompanied by a disclosure indicating that the toolbar is *generated* or updated via a Pinger process or a MOT script." IPR2017-00967 at 9 (emphasis added); *see also* IPR2018-00117 at 11 (same); IPR2018-00118 at 11 (same).

The Court does not adopt the "can be generated" limitation from the PTAB's construction because the specifications do not consistently disclose that the "toolbar" has this feature, nor do the specifications highlight this as a capability of the "toolbar." Specifically, the specifications do not list "can be generated [by a Pinger process or a MOT script]" among the "unique properties" of the "Toolbar of the present invention"—instead only stating that the "unique properties" relate to "dynamically changing or updating." '863 Patent col. 10:15-17; '070 Patent col. 10:24-26 (same). Furthermore, generation of a toolbar appears in Figure 16, which "provides a simplified example of a button bar, power bar, or tool bar that *can be generated* using the referenced MOT script language." '863 Patent col. 26:55-57 (emphasis added). Although the specifications describe Figure 16 as "illustrating a an [sic] example of a customized button bar that may be generated using the MOT script in accordance with the teachings of this invention," this statement merely highlights that generating via a MOT script is only "in accordance with" the invention and is not a critical feature of the invention. *Id.* col. 4:26-28. Indeed, this conclusion is consistent with the specifications' disclosure of "toolbar" elsewhere, which only addresses dynamically changing or updating the toolbar, without reference to "generating" the toolbar. *See id.* col. 10:7-37. Because the "can be generated" limitation merely appears in an exemplary embodiment and not in the "unique properties" of the "Toolbar of the present invention," the Court finds that including "generated" in the construction of "toolbar" would improperly import a limitation from the specifications.

In addition, the Court also notes that the PTAB used the term "dynamically" twice in its construction (i.e., "can be generated, dynamically changed, or *dynamically* updated). However, the Court finds this change non-substantive because the change merely reflects the PTAB's use of serial commas. In *Yahoo!*, the district court used "dynamically changed or updated," and the

PTAB used "generated, dynamically updated, or dynamically changed." *Yahoo!*, 2017 WL 3978190, at *7; IPR2017-00967 at 10. Indeed, the PTAB acknowledged only one difference between the PTAB's construction and the *Yahoo!* district court's construction. The PTAB stated that its "construction differs from the district court's construction in the addition of 'generating.'" IPR2017-00967 at 11.

The Court notes that MyMail asks the Court to construe "toolbar" as "a button bar that can be generated, dynamically changed, or updated via a Pinger process or a MOT script." In other words, MyMail's proposed construction omits the second "dynamically" while still maintaining the PTAB's use of serial commas, such that "updated" is not modified by "dynamically." Opening Br. at 2. MyMail provides no justification for omitting the second "dynamically," and the specifications explicitly disclose a toolbar that "can be dynamically changed or updated via a Pinger process or a MOT script." '863 Patent col. 10:15-17. As the PTAB noted, "dynamically" modifies both "changed" and "updated." IPR2017-00967 at 10. The Court therefore rejects MyMail's proposed construction.

### 4. Defendants' Arguments Regarding the Patents' Specifications Are Unpersuasive

Turning to Defendants' arguments, the Court is unpersuaded that the Court's construction "would have no practical limiting effect on the claims" or that the Court's construction would "confuse the jury." Resp. Br. at 7-8.

First, although the Court's construction does not require that the toolbar must be dynamically changed or updated by a Pinger process or MOT script to practice the patented invention, the construction nonetheless requires that the toolbar is capable of being dynamically changed or updated in that manner. Defendants argue that "even if the Court were to adopt MyMail's proposed construction, it would have no practical limiting effect on the claims because . . . the Pinger performs operations that are redundant to features recited elsewhere in the claims." *Id.* at 7. Further, Defendants contend that MyMail's proposal would also not limit the claims because MyMail's "construction expressly identifies Pingers and MOT scripts as *optional*—not mandatory." *Id.* (emphasis added). Therefore, according to Defendants, MyMail's "open-ended"

18

construction fails to affect the claims' scope, which Defendants argue weighs against adopting MyMail's construction. *Id.* at 6-7.

The Court disagrees with Defendants' argument and concludes that the Court's construction imposes a meaningful limitation on the claims. Particularly, this construction requires that the toolbar have the capability of being dynamically changed or updated by a Pinger process or MOT script, regardless of whether the toolbar can be dynamically changed or updated by other means. For instance, a toolbar that practices all the limitations of the claims of the '863 and '070 patents, but which could not be dynamically changed or updated by a Pinger process or a MOT script, would fall outside the scope of "toolbar" and not infringe. Likewise, prior art that teaches the claimed invention, but which discloses a toolbar incapable of being dynamically changed or updated by a Pinger process or a MOT script would not anticipate the claims under this construction.

Indeed, the previous PTAB decisions illustrate that the Court's construction provides a meaningful limitation. There, the PTAB repeatedly upheld the validity of the MyMail patents under 35 U.S.C. §§ 102 and 103, in part, based on the limitation that the toolbar must be capable of being dynamically changed or updated by a Pinger process or a MOT script. *See, e.g.*, IPR2017-00967 at 17 ("Petitioner does not persuade us that the ordinary skilled artisan would have understood that category buttons [in the prior art reference] could have been updated by a MOT script or a Pinger process"); IPR2018-00118 ("Petitioner does not address how [the prior art's] toolbar 'can be generated, dynamically changed, or dynamically updated via a Pinger process or a MOT script'"). These decisions illustrate that the Court's construction is not redundant and would instead limit the claims of the '863 and '070 patents. As such, the Court finds that Defendants' argument does not weigh against adopting the Court's construction.

Second, Defendants argue that MyMail's proposed construction is improper because it would "confuse the jury." Resp. Br. at 8. As MyMail highlights, Defendants' contention "is not a claim construction argument," Reply at 3, and Defendants cite to no case law to support this argument. Furthermore, Defendants' argument that "MyMail's proposals . . . inject[] uncertainty

19

into an ordinary term that is familiar to a jury" is misplaced.  Resp. Br. at 8.  Contrary to

Defendants' assertion, the specifications do not "confirm the term 'toolbar' is familiar to ordinary

users." *Id.*  Instead, as previously discussed, the toolbar of the present invention is not an

"ordinary" toolbar, but rather a toolbar with the "unique property" in that the toolbar "can be

dynamically changed or updated via a Pinger process or a MOT script."  '863 Patent col. 10:16-

17.  As such, because the "toolbar" in the '863 and '070 patents is unique and not an ordinary

toolbar, it is irrelevant whether a jury would be familiar with the ordinary meaning of "toolbar."

In sum, because the specifications consistently disclose a toolbar that can be "dynamically

changed or updated via a Pinger process or a MOT script," and because the specifications describe

this capability as a "unique propert[y]" of the "Toolbar of the *present invention*," the Court

construes "toolbar" as consistent with this definition.  As such, the Court construes "toolbar" as "a

button bar that can be dynamically changed or updated via a Pinger process or a MOT script."

### B. Defendants' Prosecution History Arguments

Defendants' final argument relies on the prosecution history of the '863 and '070 patents.

The parties dispute the significance of a definition of "toolbar" that appears in an Information

Disclosure Statement ("IDS") that MyMail sent to the USPTO during prosecution of the MyMail

patents.  *See* Resp. Br. at 4-5; Reply at 1-2.  In the IDS, MyMail defined "toolbar" as "[a] row or

column of on-screen buttons used to activate functions in the application" and submitted the

definition "as [an] indication[] of the meaning to one of ordinary skill in the art of the respective

claim term[]."  ECF No. 143-4 at 3-4 ("IDS").  On this basis, Defendants argue that the Court

should rely on the language from the IDS and construe "toolbar" as "an arrangement of user

controls to activate functions in an application" because MyMail provided a "clear, unmistakable

definition."  Resp. Br. at 5.

MyMail responds that Defendants' construction "does not appear in any claim language or

in the specifications of the MyMail patents" and "is entirely inconsistent with the explicit

definition of 'toolbar' provided in the specification[s]."  Reply at 1.  MyMail additionally argues

that MyMail's additional statement in the IDS that "Applicant neither adopts nor intends for the

claim terms to be limited" to the IDS definition demonstrates that "the IDS was not intended to expand, limit or otherwise alter the meaning of 'toolbar' as that term was defined in the specification[s]." *Id.* at 1-2.

The Court agrees with MyMail that the definition from the IDS does not supersede the definition of "toolbar" from the specifications. Although the IDS states that MyMail "submits such definitions . . . as indications of the meaning to one of ordinary skill in the art of the respective claim terms," the IDS is not ultimately definitional for several reasons. IDS at 4. First, when viewing the IDS as a whole, the Court finds that MyMail's clarifying statement in the same IDS weighs heavily against adopting Defendants' construction. Second, although the IDS constitutes intrinsic evidence, Federal Circuit precedent accords greater weight to a patent's specification than to its prosecution history. Third, even if MyMail intended the definition from the IDS to govern, the definition in the IDS is not mutually exclusive of the Court's claim construction. The Court addresses each of these reasons in turn.

First, the Court finds that the IDS, taken as a whole with MyMail's clarifying statement in the same IDS, gives an insufficiently clear definition of "toolbar" to dictate the claim term's meaning. The Federal Circuit has recognized that a patentee's "clear and unmistakable" statement during prosecution can serve to disclaim claim scope and to define a disputed phrase. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). However, statements that are ambiguous or unclear are generally not definitional. *See Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1294-95 (Fed. Cir. 2000) (declining to adopt a definition from a patent's prosecution history where the patentee had not defined the term "with reasonable clarity and deliberateness").

Here, when taken as a whole, the IDS does not give a sufficiently clear and unmistakable definition for "toolbar." Specifically, Defendants cite the allegedly definitional phrase in isolation and ignore MyMail's later clarification in the same IDS. *See* Resp. Br. at 4-5. Specifically, in the same IDS, MyMail later states that MyMail "*neither adopts nor intends for* the claim terms to be *limited solely to the collection of definitions* or any specific definition in the submitted references."

21

IDS at 4-5 (emphasis added). This clarifying phrase occurs only three paragraphs after the definition of "toolbar" on which Defendants rely. As such, the Court agrees with MyMail that such a clarifying statement precludes treating the IDS's language as definitional. *Id.*

Second, Federal Circuit precedent establishes that courts should generally accord greater weight to a patent's specification than to its prosecution history. A patent's prosecution history qualifies as intrinsic evidence and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83). However, a patent's specification is often more informative than its prosecution history as "the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, [and thus] it often lacks the clarity of the specification and thus is less useful for claim construction." *Id.* This holding is particularly relevant here because the IDS itself does not treat the definition of "toolbar" as binding. Furthermore, MyMail did not ultimately adopt the definition from the IDS when the patents ultimately issued because the IDS's definition of "toolbar" does not appear in either the '863 or the '070 patents as issued. As such, these characteristics highlight that the definition in the IDS merely reflects on "ongoing negotiation between the PTO and the applicant," *id.*, and is therefore insufficient to supplant the definition from the patents' final specifications.

Third, the IDS's definition is not mutually exclusive of the specifications' definition. Primarily, the language in the IDS describes the visual appearance or arrangement of a toolbar, whereas the specifications' definition describes how to dynamically change or update the toolbar. *Compare* IDS at 3-4 *with* '863 Patent col. 10:16-17. For example, the IDS states that MyMail "intends 'toolbar' to comprise buttons in any other arrangement, such as, for example and without limitation, multiple rows or columns, one or more circles of buttons, adjoined and/or separate buttons, stationary or moving buttons, and/or buttons arranged in irregular and/or regular shapes." *Id.* In contrast, the definition from the MyMail patents' specifications describes the processes and

22

scripts the toolbar uses for "dynamically chang[ing] or updat[ing]." '863 Patent col. 10:16-17; '070 Patent col. 10:25-26.

Thus, the two definitions of "toolbar" speak to different characteristics—the IDS describes a visual appearance while the specifications describe a means of dynamically changing or updating. Indeed, the PTAB in two of the previous IPR proceedings reached this exact conclusion. *See* IPR2018-00117 at 13; IPR 2018-00118 at 13. There, the PTAB found that MyMail's "statements during prosecution relate to the visual appearance of the buttons [which is not] mutually exclusive with respect to the definition set forth in the [MyMail] patent[s]." IPR2018-00117 at 13; IPR 2018-00118 at 13. The Court reaches the same conclusion as the PTAB and finds that even if the IDS is definitional, that definition is not mutually exclusive of the Court's construction.

Accordingly, the prosecution history of the '863 and '070 patents does not alter the Court's construction of "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script."

## IV. CONCLUSION

For the foregoing reasons, the Court construes the disputed claim term "toolbar" from the '863 and '070 patents as follows: "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script."

**IT IS SO ORDERED.**

Dated: March 4, 2020

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge