1
2
3
4
5
6
7
8                                UNITED STATES DISTRICT COURT

9                              NORTHERN DISTRICT OF CALIFORNIA

10                                      SAN JOSE DIVISION

11

12   MYMAIL, LTD.,                          Case No. 17-CV-04487-LHK
                                            Case No. 17-CV-04488-LHK
13                  Plaintiff,
                                            **ORDER GRANTING DEFENDANTS'**
14          v.                              **RENEWED MOTION FOR**
                                            **JUDGMENT ON THE PLEADINGS**
15   OOVOO, LLC,
                                            Re: Dkt. No. 159
16                  Defendant.

17

18   MYMAIL, LTD.,

19                  Plaintiff,

20          v.

21   IAC SEARCH & MEDIA, INC.,

22                  Defendant.

23          Plaintiff MyMail, Ltd. ("MyMail") filed patent infringement actions against Defendants

24   ooVoo, LLC ("ooVoo") and IAC Search & Media, Inc. ("IAC") (collectively, "Defendants").

25   MyMail alleges that Defendants infringe claims of U.S. Patent No. 8,275,863 ("the '863 Patent")

26   and U.S. Patent No. 9,021,070 ("the '070 Patent") (collective, "MyMail patents" or "the patents").

27

28                                             1
     Case No. 17-CV-04488-LHK
     ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

Before the Court is Defendants' renewed motion for judgment on the pleadings.[1]  *See* ECF No. 159.[2]  Having considered the submissions of the parties, the relevant law, and the records in these cases, the Court GRANTS Defendants' renewed motion for judgment on the pleadings.

## I.     BACKGROUND

### A.  Factual Background

#### 1.  The Parties

Plaintiff MyMail is a "Texas Limited Partnership" with a primary place of business in Athens, Texas.  ooVoo ECF No. 1 ¶ 1.  MyMail is the assignee of the '863 and '070 Patents.  *Id.* ¶ 9.  Defendant ooVoo is a Delaware corporation with its primary place of business in New York, New York.  *Id.* ¶ 2.  Defendant IAC is a Delaware corporation with its primary place of business in Oakland, California.  ECF No. 1 ¶ 2.

#### 2.  The Patents

The '863 Patent is titled "Method of Modifying a Toolbar."  ECF No. 143-1 ('863 Patent). It was filed on April 16, 2003 and issued on September 25, 2012.  The '070 Patent is titled "Dynamically Modifying a Toolbar."  ECF No. 143-2 ('070 Patent).  It was filed on June 20, 2013 and issued on April 28, 2015.  The two patents are related.  Specifically, the '070 Patent is a continuation of U.S. Application No. 13/573,311, which in turn is a continuation application of the '863 Patent.  Thus, the '863 Patent and the '070 Patent share similar claims, identical figures, and nearly identical specifications.  As such, for simplicity, the Court's citations to the text and figures of the MyMail patents refer to the '863 Patent.

The patents state that they relate "in general to digital data networks and, more particularly,

---

[1] Defendants' renewed motion for judgment on the pleadings includes a notice of motion that is separate from the memorandum of points and authorities.  Civil Local Rule 7-2(b) provides that the notice of motion and points and authorities should be contained in one document.  *See* Civ. L. R. 7-2(b).

[2] On January 8, 2020, the Court consolidated Case Nos. 17-CV-4487 and 17-CV-4488 and designated Case No. 17-CV-04488 as the lead case.  ECF No. 139 at 2. "ECF No." refers to docket entries in Case No. 17-CV-04488.  *Id.*  "ooVoo ECF No." denotes docket entries in Case No. 17-CV-4487 that were filed prior to consolidation and were not added to the docket in Case No. 17-CV-04488.

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

United States District Court
Northern District of California

to network access and to minimizing unauthorized interception of data and denial of network services." '863 Patent col. 1:26-29.  However, the patents also describe a method for updating toolbars or "button bars" that are displayed on Internet-connected devices such as personal computers.  *Id.* at col. 10:7-11:16.  Specifically, the patents disclose a toolbar database that stores data defining the attributes of the toolbar, like button captions and button functionality.  *Id.* at col. 10:38-11:4.  When the device that displays the toolbar is connected to the internet, the device executes software called a "client dispatch application" that initiates a "pinger" to update the toolbar database, along with other databases.  *Id.* at col. 11:44-47, col. 12:16-17, col. 17:30-32.  The pinger sends information about those databases to a network server, which in turn uses the sent information to determine whether any of the databases require updates.  *Id.* at col. 11:47-52, col. 12:17-24, col. 17:32-40.  If any updates are required, the server sends those updates to the device.  *Id.* at col. 17:40-66.

MyMail asserts claims 1-5, 9-13, 16-17, 19-20, and 23 of the '863 Patent and claims 1-13 and 15-22 of the '070 Patent.  ECF No. 109 at 5.

### B.  Procedural History

On November 18, 2016, MyMail filed its complaint for patent infringement against Defendant ooVoo in the United States District Court for the Eastern District of Texas.  *See* ooVoo ECF No. 1.  Then, on December 20, 2016, MyMail filed its complaint for patent infringement against Defendant IAC in the same court.  *See* ECF No. 1.

On February 2, 2017, ooVoo moved to dismiss MyMail's action for improper venue, answered MyMail's complaint, and asserted counterclaims against MyMail.  ooVoo ECF Nos. 18, 19.  On February 3, 2017, MyMail opposed ooVoo's motion to dismiss for improper venue.  ooVoo ECF No. 24.

Similarly, on February 13, 2017, IAC moved to dismiss MyMail's action for improper venue, answered MyMail's complaint, and asserted counterclaims against MyMail.  ECF Nos. 16, 17.  On that same day, MyMail opposed IAC's motion to dismiss for improper venue.  ECF No. 20.

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

1       On February 23, 2017, MyMail answered ooVoo's counterclaims.  ooVoo ECF No. 27.

2   On March 6, 2017, MyMail answered IAC's counterclaims.  ECF No. 27.

3       On July 11, 2017, the United States District Court for the Eastern District of Texas

4   transferred both of MyMail's actions to this district.  ooVoo ECF No. 33; ECF No. 70.  MyMail's

5   action against ooVoo was originally assigned to United States Magistrate Judge Susan van

6   Keulen, *see* ooVoo ECF No. 35, and MyMail's action against IAC was originally assigned to

7   United States Magistrate Judge Joseph Spero.  *See* ECF No. 72.  However, MyMail declined

8   magistrate judge jurisdiction in both actions.  ooVoo ECF No. 36; ECF No. 74.  Thus, on

9   September 1, 2017, MyMail's action against ooVoo was reassigned to the undersigned judge,

10  ooVoo ECF No. 38, and MyMail's action against IAC was reassigned to United States District

11  Judge Phyllis J. Hamilton, ECF No. 77.

12      On October 2, 2017, MyMail filed a motion to relate MyMail's action against IAC to

13  MyMail's action against ooVoo.  ooVoo ECF No. 48.  On October 10, 2017, the Court granted

14  MyMail's motion to relate.  ooVoo ECF No. 55. As a result, MyMail's action against IAC was

15  reassigned to the undersigned judge.  ECF No. 93.

16      On October 31, 2017, Defendants filed motions for judgment on the pleadings that sought

17  to invalidate MyMail's patents under 35 U.S.C. § 101.  ooVoo ECF No. 62; ECF No. 101.  On

18  March 16, 2018, the Court granted Defendants' motion for judgment on the pleadings,

19  invalidating MyMail's patents under 35 U.S.C. § 101.  ooVoo ECF No. 90; ECF No. 129.  On

20  March 26, 2018, MyMail filed a notice of appeal to the Federal Circuit Court of Appeals.  ooVoo

21  ECF No. 92; ECF No. 131.

22      On August 16, 2019, a divided panel of the Federal Circuit Court of Appeals vacated and

23  remanded the Court's order granting Defendants' motion for judgment on the pleadings because

24  the Court did not construe the term "toolbar."  *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1380

25  (Fed. Cir. 2019).

26      On October 1, 2019, Defendants filed renewed motions for judgment on the pleadings and

27  again sought to invalidate the patents under 35 U.S.C. § 101.  ooVoo ECF No. 98; ECF No. 133.

28

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

However, on January 8, 2020, at a case management conference, the parties agreed that the Court should first construe the term "toolbar" before addressing Defendants' renewed motions. ECF No. 139. Accordingly, the Court denied without prejudice Defendants' renewed motions for judgment on the pleadings. The Court also consolidated the cases under Case No. 17-CV-04488. *Id.*

In response to the Court's case management order, the parties filed claim construction briefing, ECF Nos. 140, 143, 144, and on March 4, 2020, the Court construed the term "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script." ECF No. 156 ("Claim Constr. Order").

Accordingly, on March 26, 2020, Defendants filed the instant renewed motion for judgment on the pleadings. ooVoo ECF No. 110 (later refiled as ECF No. 159 ("Mot.")). On April 4, 2020, MyMail filed an opposition, ECF No. 160 ("Opp."), and on April 16, 2020, Defendants filed a reply. ECF No. 161 ("Reply").

## II.    LEGAL STANDARD

### A.    Motion For Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (brackets and internal quotation marks omitted). Like a motion to dismiss under Rule 12(b)(6), a motion under Rule 12(c) challenges the legal sufficiency of the claims asserted in the complaint. *See id.* Indeed, a Rule 12(c) motion is "functionally identical" to a Rule 12(b)(6) motion, and courts apply the "same standard." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (explaining that the "principal difference" between Rule 12(b)(6) and Rule 12(c) "is the timing of filing"); *see also U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).

Judgment on the pleadings should thus be entered when a complaint does not plead

United States District Court
Northern District of California

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).  For purposes of ruling on a Rule 12(c) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

**B.  Patent Eligibility Challenges Under 35 U.S.C. § 101**

Defendants' motion argues that the patents-in-suit fail to claim patent-eligible subject matter under 35 U.S.C. § 101 in light of the United States Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014).  The ultimate question whether a claim recites patent-eligible subject matter under § 101 is a question of law.  *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1338 (Fed. Cir. 2017) ("Patent eligibility under § 101 is an issue of law[.]"); *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014) (same).  Although the Federal Circuit has noted that the § 101 analysis "may contain disputes over underlying facts," it has also made clear that patent eligibility can often be resolved on the pleadings.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ("As our cases demonstrate, not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry."); *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017) (affirming determination of ineligibility made on 12(b)(6) motion).  Accordingly, a district court may resolve the issue of patent eligibility under § 101 by way of a motion for judgment on the pleadings.  *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014) (affirming determination of ineligibility made on motion for judgment on the pleadings).

**C.  Substantive Legal Standards Applicable Under 35 U.S.C. § 101**

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

United States District Court
Northern District of California

**1. Patent-Eligible Subject Matter Under 35 U.S.C. § 101**

Section 101 of Title 35 of the United States Code "defines the subject matter that may be patented under the Patent Act." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010).  Under § 101, the scope of patentable subject matter encompasses "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." *Id.* (quoting 35 U.S.C. § 101).  These categories are broad, but they are not limitless.  Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 573 U.S. at 216 (citation omitted).  These three categories of subject matter are excepted from patent-eligibility because "they are the basic tools of scientific and technological work," which are "free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (citations omitted).  The United States Supreme Court has explained that allowing patent claims for such purported inventions would "tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Id.*  However, the United States Supreme Court has also cautioned that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217 (alteration, internal quotation marks, and citation omitted). Accordingly, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Id.*

In *Alice*, the leading case on patent-eligible subject matter under § 101, the United States Supreme Court refined the "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" originally set forth in *Mayo*, 566 U.S. at 77.  *Alice*, 573 U.S. at 217.  This analysis, generally known as the "*Alice*" framework, proceeds in two steps as follows:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts.  If so, we then ask, "[w]hat else is there in the claims before us?"  To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.  We have described step two of this analysis as a search for an "'inventive concept'"—

7

*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Id.* at 217-18 (alterations in original) (citations omitted); *see also In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (describing "the now familiar two-part test described by the [United States] Supreme Court in *Alice*").

### 2. *Alice* Step One—Identification of Claims Directed to an Abstract Idea

Neither the United States Supreme Court nor the Federal Circuit has set forth a bright-line test separating abstract ideas from concepts that are sufficiently concrete so as to require no further inquiry under the first step of the *Alice* framework. *See, e.g.*, *Alice*, 573 U.S. at 221 (noting that "[the United States Supreme Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case"); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (observing that the United States Supreme Court did not "delimit the precise contours of the 'abstract ideas' category" in *Alice* (citation omitted)).  As a result, in evaluating whether particular claims are directed to patent-ineligible abstract ideas, courts have generally begun by "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

Two of the United States Supreme Court's leading cases concerning the "abstract idea" exception involved claims held to be abstract because they were drawn to longstanding, fundamental economic practices.  *See Alice*, 573 U.S. at 219 (claims "drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk" were directed to a patent-ineligible abstract idea); *Bilski*, 561 U.S. at 611-12 (claims drawn to "the basic concept of hedging, or protecting against risk" were directed to a patent-ineligible abstract idea because "[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class" (citation omitted)).

Similarly, the United States Supreme Court has recognized that information itself is intangible.  *See Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 451 n.12 (2007).  Accordingly, the Federal Circuit has generally found claims abstract where they are directed to some

8

United States District Court
Northern District of California

1  combination of acquiring information, analyzing information, and/or displaying the results of that

2  analysis.  *See FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094-95 (Fed. Cir. 2016)

3  (claims "directed to collecting and analyzing information to detect misuse and notifying a user

4  when misuse is detected" were drawn to a patent-ineligible abstract idea); *Elec. Power Grp., LLC*

5  *v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (claims directed to an abstract idea because

6  "[t]he advance they purport to make is a process of gathering and analyzing information of a

7  specified content, then displaying the results, and not any particular assertedly inventive

8  technology for performing those functions"); *In re TLI Commc'ns LLC*, 823 F.3d at 611 (claims

9  were "directed to the abstract idea of classifying and storing digital images in an organized

10  manner"); *see also Elec. Power Grp.*, 830 F.3d at 1353-54 (collecting cases).

11      However, the determination of whether other types of computer-implemented claims are

12  abstract has proven more "elusive."  *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790

13  F.3d 1343, 1345 (Fed. Cir. 2015) ("[P]recision has been elusive in defining an all-purpose

14  boundary between the abstract and the concrete[.]").  As a result, in addition to comparing claims

15  to prior United States Supreme Court and Federal Circuit precedents, courts considering

16  computer-implemented inventions have taken varied approaches to determining whether particular

17  claims are directed to an abstract idea.

18      For example, courts have considered whether the claims "purport to improve the

19  functioning of the computer itself," *Alice*, 573 U.S. at 225, which may suggest that the claims are

20  not abstract, or instead whether "computers are invoked merely as a tool" to carry out an abstract

21  process, *Enfish*, 822 F.3d at 1336; *see also id.* at 1335 ("[S]ome improvements in computer-

22  related technology when appropriately claimed are undoubtedly not abstract, such as a chip

23  architecture, an LED display, and the like.  Nor do we think that claims directed to software, as

24  opposed to hardware, are inherently abstract[.]").  The Federal Circuit has followed this approach

25  to find claims patent-eligible in several cases.  *See Visual Memory LLC v. NVIDIA Corp.*, 867

26  F.3d 1253, 1259-60 (Fed. Cir. 2017) (claims directed to an improved memory system were not

27  abstract because they "focus[ed] on a 'specific asserted improvement in computer capabilities'—

28

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

*United States District Court*
*Northern District of California*

1   the use of programmable operational characteristics that are configurable based on the type of

2   processor" (quoting *Enfish*, 822 F.3d at 1336)); *McRO, Inc. v. Bandai Namco Games Am. Inc.*,

3   837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims directed to automating part of a preexisting method

4   for 3-D facial expression animation were not abstract because they "focused on a specific asserted

5   improvement in computer animation, i.e., the automatic use of rules of a particular type"); *Enfish*,

6   822 F.3d at 1335-36 (claims directed to a specific type of self-referential table in a computer

7   database were not abstract because they focused "on the specific asserted improvement in

8   computer capabilities (i.e., the self-referential table for a computer database)").

9       Similarly, the Federal Circuit has found that claims directed to a "new and useful

10  technique" for performing a particular task were not abstract. *See Thales Visionix Inc. v. United

11  States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (holding that "claims directed to a new and useful

12  technique for using sensors to more efficiently track an object on a moving platform" were not

13  abstract); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048, 1050 (Fed. Cir. 2016)

14  (holding that claims directed to "a new and useful laboratory technique for preserving

15  hepatocytes," a type of liver cell, were not abstract); *see also Diamond v. Diehr*, 450 U.S. 175,

16  187 (1981) (holding that claims for a method to cure rubber that employed a formula to calculate

17  the optimal cure time were not abstract).

18      By contrast, courts have frequently invalidated claims that have a close analogy in the

19  brick-and-mortar world, such that the claims cover "'fundamental practices long prevalent in our

20  system' and 'methods of organizing human activity.'" *Intellectual Ventures I LLC v. Symantec

21  Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) (quoting *Alice*, 573 U.S. at 219) (alterations omitted)

22  (finding an email processing software program to be abstract through comparison to a "brick-and-

23  mortar" post office); *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D.

24  Del. 2015) ("Another helpful way of assessing whether the claims of the patent are directed to an

25  abstract idea is to consider if all of the steps of the claim could be performed by human beings in a

26  non-computerized 'brick and mortar' context." (citing *buySAFE, Inc. v. Google, Inc.*, 765 F.3d

27  1350, 1353 (Fed. Cir. 2014)).

28

10

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

1       Courts will also (or alternatively, as the facts require) consider a related question of

2 whether the claims are, in essence, directed to a mental process or a process that could be done

3 with pencil and paper. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1147 (Fed.

4 Cir. 2016) (claims for translating a functional description of a logic circuit into a hardware

5 component description of the logic circuit were patent-ineligible because the "method can be

6 performed mentally or with pencil and paper"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654

7 F.3d 1366, 1372 (Fed. Cir. 2011) (claim for verifying the validity of a credit card transaction over

8 the Internet was patent-ineligible because the "steps can be performed in the human mind, or by a

9 human using a pen and paper"); *see also, e.g.*, *Mortg. Grader, Inc. v. First Choice Loan Servs.*

10 *Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims for computer-implemented system to enable

11 borrowers to shop for loan packages anonymously were abstract where "[t]he series of steps

12 covered by the asserted claims . . . could all be performed by humans without a computer").[3]

13       At all events, however, the Federal Circuit has emphasized that "the first step of the [*Alice*]

14 inquiry is a meaningful one." *Enfish*, 822 F.3d at 1335. In particular, the court's task is not to

15 determine whether claims merely involve an abstract idea at some level, *see id.*, but rather to

16 examine the claims "in their entirety to ascertain whether their character as a whole is directed to

17 excluded subject matter," *Internet Patents*, 790 F.3d at 1346.

18     **3. *Alice* Step Two—Evaluation of Abstract Claims for a Limiting Inventive Concept**

19       A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations—

20 considered individually or as an ordered combination—serve to "transform the claims into a

21 patent-eligible application." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat.*

22 *Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Thus, the second step of the *Alice* analysis (the

23 search for an "inventive concept") asks whether the claim contains an element or combination of

---

25 [3] One court has noted that, like all tools of analysis, the "pencil and paper" analogy must not be
unthinkingly applied. *See Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995

26 (C.D. Cal. 2014) (viewing pencil-and-paper test as a "stand-in for another concern: that humans
engaged in the same activity long before the invention of computers," and concluding that test was

27 unhelpful where "error correction codes were not conventional activity that humans engaged in
before computers").

28 Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

1    elements that "ensure[s] that the patent in practice amounts to significantly more than a patent

2    upon the [abstract idea] itself."  573 U.S. at 218 (citation omitted).

3         The United States Supreme Court has made clear that transforming an abstract idea to a

4    patent-eligible application of the idea requires more than simply reciting the idea followed by

5    "apply it."  *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72).  In that regard, the Federal Circuit has

6    repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be

7    deemed meaningful in the context of this analysis, it must involve more than performance of

8    'well-understood, routine, [and] conventional activities previously known to the industry.'"

9    *Content Extraction*, 776 F.3d at 1347-48 (alteration in original) (quoting *Alice*, 573 U.S. at 225);

10   *see also Mortg. Grader*, 811 F.3d at 1324-25 (holding that "generic computer components such as

11   an 'interface,' 'network,' and 'database' . . . do not satisfy the inventive concept requirement");

12   *Bancorp Servs.*, 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer

13   must be integral to the claimed invention, facilitating the process in a way that a person making

14   calculations or computations could not.").

15        Likewise, "[i]t is well-settled that mere recitation of concrete, tangible components is

16   insufficient to confer patent eligibility to an otherwise abstract idea" where those components

17   simply perform their "well-understood, routine, conventional" functions.  *In re TLI Commc'ns*

18   *LLC*, 823 F.3d at 613 (citation omitted); *see also id.* (ruling that "telephone unit," "server," "image

19   analysis unit," and "control unit" limitations were insufficient to satisfy *Alice* step two where

20   claims were drawn to abstract idea of classifying and storing digital images in an organized

21   manner).  "The question of whether a claim element or combination of elements is well-

22   understood, routine and conventional to a skilled artisan in the relevant field is a question of fact"

23   that "must be proven by clear and convincing evidence."  *Berkheimer*, 881 F.3d at 1368.  This

24   inquiry "goes beyond what was simply known in the prior art."  *Id.* at 1369.

25        In addition, the United States Supreme Court explained in *Bilski* that "limiting an abstract

26   idea to one field of use or adding token postsolution components [does] not make the concept

27   patentable."  561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584 (1978)); *see also Alice*, 573

28

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

1   U.S. at 223 (same).  The Federal Circuit has similarly stated that attempts "to limit the use of the

2   abstract idea to a particular technological environment" are insufficient to render an abstract idea

3   patent-eligible.  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (internal

4   quotation marks and citation omitted); *see also Intellectual Ventures I LLC v. Capital One Bank*

5   *(USA)*, 792 F.3d 1363, 1366 (Fed. Cir. 2015) ("An abstract idea does not become nonabstract by

6   limiting the invention to a particular field of use or technological environment, such as the

7   Internet.").

8        In keeping with these restrictions, the Federal Circuit has found that claims "necessarily

9   rooted in computer technology in order to overcome a problem specifically arising in the realm of

10  computer networks" can be sufficiently transformative to supply an inventive concept.  *DDR*, 773

11  F.3d at 1257; *see also id.* at 1248, 1259 (concluding that claims that addressed the "Internet-

12  centric problem" of third-party merchant advertisements that would "lure . . . visitor traffic away"

13  from a host website amounted to an inventive concept).

14       In addition, a "non-conventional and non-generic arrangement of known, conventional

15  pieces" can amount to an inventive concept.  *BASCOM Glob. Internet Servs., Inc. v. AT&T*

16  *Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).  For example, in *BASCOM*, the Federal

17  Circuit addressed a claim for Internet content filtering performed at "a specific location, remote

18  from the end-users, with customizable filtering features specific to each end user."  *Id.*  Because

19  this "specific location" was different from the location where Internet content filtering was

20  traditionally performed, the Federal Circuit concluded this was a "non-conventional and non-

21  generic arrangement of known, conventional pieces" that provided an inventive concept.  *Id.*  As

22  another example, in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, the Federal Circuit held that

23  claims relating to solutions for managing accounting and billing data over large, disparate

24  networks recited an inventive concept because they contained "specific enhancing limitation[s]

25  that necessarily incorporate[d] the invention's distributed architecture."  841 F.3d 1288, 1301

26  (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 469 (Nov. 27, 2017).  The use of a "distributed

27  architecture," which stored accounting data information near the source of the information in the

28

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

1   disparate networks, transformed the claims into patentable subject matter.  *Id.*

2       **4. Preemption**

3       In addition to these principles, courts sometimes find it helpful to assess claims against the

4   policy rationale for § 101.  The United States Supreme Court has recognized that the "concern that

5   undergirds [the] § 101 jurisprudence" is preemption.  *Alice*, 573 U.S. at 223.  Thus, courts have

6   readily concluded that a claim is not patent-eligible when the claim is so abstract that it preempts

7   "use of [the claimed] approach in all fields" and "would effectively grant a monopoly over an

8   abstract idea."  *Bilski*, 561 U.S. at 612.  However, the inverse is not true: "[w]hile preemption may

9   signal patent ineligible subject matter, the absence of complete preemption does not demonstrate

10   patent eligibility."  *FairWarning*, 839 F.3d at 1098 (alteration in original) (citation omitted).

**III.   DISCUSSION**

12       Defendants' renewed motion for judgment on the pleadings contends that the asserted

13   claims of the patents-in-suit fall within the patent-ineligible "abstract ideas" exception to § 101.

14   *See* Mot. at 7.  The Court applies the *Alice* framework described above to the claims of the '863

15   and '070 Patents.

16       However, the Court need not individually analyze every claim if certain claims are

17   representative.  *See generally Alice*, 573 U.S. at 224-26 (finding claims to be patent-ineligible

18   based on analysis of one representative claim).  In the parties' briefing for Defendants' initial

19   motion for judgment on the pleadings, both MyMail and Defendants agreed that claim 1 of the

20   '863 Patent and claim 1 of the '070 Patent were representative.  ECF No. 101 at 16; ECF No. 109

21   at 5-6.  For the current motion, Defendants continue to identify claim 1 of each patent as

22   representative.  *See* Mot. at 3.  MyMail does not dispute that claim 1 of each patent continues to be

23   representative.  *See* Opp. at 1-6.  As a result, the Court treats claim 1 of the '863 Patent and claim

24   1 of the '070 Patent as representative.

25       Claim 1 of the '863 Patent recites:

26          1. A method of modifying a toolbar, comprising the steps of:

27          a user Internet device displaying a toolbar comprising one or more buttons, the

28

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

toolbar defined by toolbar data stored in one or more toolbar-defining databases, the toolbar data comprising a plurality of attributes, each attribute associated with a button of the toolbar, wherein for each button of the toolbar, at least one of the plurality of attributes identifying a function to be performed when the button is actuated by the user Internet device;

the user Internet device automatically sending a revision level of the one or more toolbar-defining databases to a predetermined network address;

a server at the predetermined network address determining, from the revision level, the user Internet device should receive the toolbar update data;

the user Internet device receiving toolbar update data from the Internet;

the user Internet device initiating without user interaction an operation to update the toolbar data in accordance with the toolbar update data received;

the user Internet device updating, by the operation, the toolbar data in accordance with the toolbar update data, thereby producing updated toolbar data, the updating comprising at least one of the following steps (a) and (b), each respectively comprising:

> (a) writing at least one new attribute to the original toolbar data, wherein the writing at least one new attribute to the toolbar data comprises changing the one or more buttons of the toolbar by adding a button; and

> (b) updating at least one attribute of the toolbar data; and

the user Internet device displaying the toolbar as defined by the updated toolbar data.

'863 Patent col. 29:28-63 (emphasis added).  Similarly, claim 1 of the '070 Patent recites:

> 1. A method for dynamically modifying a toolbar, the method comprising:

> displaying the toolbar, at a user Internet device, that includes one or more toolbar buttons, the toolbar defined by toolbar data stored in one or more toolbar-defining databases, the toolbar data comprising a plurality of toolbar button attributes associated with the one or more toolbar buttons of the toolbar, wherein at least one of the plurality of toolbar button attributes identifies a function to be performed by a specific toolbar button upon actuation of the specific toolbar button;

> invoking, from the user Internet device without user intervention, communication of information associated with the one or more toolbar-defining databases to a server associated with a network address;

United States District Court
Northern District of California

receiving, at the server, the information associated with the one or more toolbar-defining databases;

determining, based on the information associated with the one or more toolbar-defining databases, that the user Internet device should receive updated toolbar data;

receiving, at the user Internet device, the updated toolbar data in response to determining that the user Internet device should receive the updated toolbar data;

initiating, at the user Internet device and without user interaction, an operation to update the toolbar data in accordance with the received updated toolbar data;

updating the toolbar data at the user Internet device based on the operation and in accordance with the updated toolbar data, thereby updating the toolbar data, the updating comprising at least one member of a group comprising (a) and (b):

(a) updating the toolbar data to include at least one new attribute of the toolbar data to change the toolbar by adding a toolbar button to the toolbar; and

(b) updating the toolbar data to modify an attribute of at least one of the one or more toolbar buttons of the toolbar;

and displaying at the user Internet device the toolbar as defined by the updated toolbar data,

wherein the information associated with the toolbar data includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number.

'070 Patent col. 29:40-30:20 (emphasis added).  Because these two claims contain substantially similar wording, and because the two patents have nearly identical specifications, the Court analyzes the claims together.  Accordingly, the Court addresses the above claims under the *Alice* step one inquiry and the *Alice* step two inquiry in light of the Court's recent construction of "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script."  *See* Claim Constr. Order. at 10.

**A.  *Alice* Step One**

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

Step one of the *Alice* framework directs the Court to assess "whether the claims at issue are directed to [an abstract idea]." *Alice*, 573 U.S. at 217. The step one inquiry "applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish*, 822 F.3d at 1335 (citation omitted). However, in distilling the character of a claim, the Court is careful not to express the claim's focus at an unduly "high level of abstraction . . . untethered from the language of the claims," but rather at a level consonant with the level of generality or abstraction expressed in the claims themselves. *Enfish*, 822 F.3d at 1337; *see also Thales Visionix*, 850 F.3d at 1347 ("We must therefore ensure at step one that we articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful.").

As an initial matter, when the Court first addressed the *Alice* step one inquiry in Defendants' first motion for judgment on the pleadings, the Court held that the claims were directed to the abstract idea of "a process for updating toolbar software over a network without user intervention." ECF No. 129 at 17. Specifically, the Court found that:

> [T]he claims recite a process of (1) sending data from a toolbar database to a server; (2) analyzing the data to determine whether the toolbar needs to be updated; (3) if the toolbar needs to be updated, sending toolbar update data from the Internet; and (4) automatically updating the toolbar in accordance with the toolbar update data. . . . Although the claims recite adding a button or changing at least one attribute of an existing button on the toolbar, *the focus of the claims is on the process by which the toolbar is updated*."

ECF No. 129 at 17 (emphasis added).

However, a divided Federal Circuit panel vacated the Court's previous holding because the Court did not construe the term "toolbar." *See MyMail*, 934 F.3d at 1380-81. Now that the Court has construed "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script," *see* Claim Constr. Order at 10, the Court addresses whether the claims are directed to an abstract idea.

In Defendants' renewed motion, Defendants argue that the Court's construction does not alter the Court's previous conclusion. *See* Mot. at 9-13. Defendants contend that even after claim

17

1    construction, "[t]he MyMail claims are analogous to claims analyzed in [] other judicial decisions

2    [that all] concluded that software update techniques are directed to abstract ideas." *Id.* at 10.

3          In opposition, MyMail argues that the asserted claims are not directed to an abstract idea

4    but are instead "directed at a toolbar with the capability of performing the updating function

5    automatically in a specific way—via a Pinger process or MOT script." Opp. at 7. Specifically,

6    MyMail contends that the patents "improved the functioning of the software updating process by

7    invoking the capability of using a Pinger process or a MOT script," and that this focus means that

8    the claims are directed to a *specific* improvement "in the functioning of computing devices [sic]

9    networks, which is a non-abstract idea." *Id.* at 9-10.

10         The Court first analyzes the claims' "character as a whole" in light of the Court's

11   construction of "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger

12   process or a MOT script." The Court then compares the claims "to those claims already found to

13   be directed to an abstract idea in previous cases" to determine whether the claims are directed to a

14   specific improvement or to an abstract idea. *Enfish*, 822 F.3d at 1334. For the reasons discussed

15   below, the Court concludes that even given the Court's construction of "toolbar" as "a button bar

16   that can be dynamically changed or updated via a Pinger process or a MOT script," the claims are

17   directed to the abstract idea of updating toolbar software over a network without user intervention.

18         **1.   The Claims' "Character as a Whole"**

19         The claims recite a process of (1) sending data from a toolbar database to a server;

20   (2) analyzing the data to determine whether the toolbar needs to be updated; (3) if the toolbar

21   needs to be updated, sending toolbar update data from the Internet; and (4) automatically updating

22   the toolbar in accordance with the toolbar update data. *See* '863 Patent col. 29:28-63; '070 Patent

23   col. 29:40-30:20. Although the claims recite adding a button or changing at least one attribute of

24   an existing button on the toolbar, the focus of the claims is on the process by which the toolbar is

25   updated. Further, the specifications of both the '893 Patent and the '070 Patent, to the extent they

26   describe toolbar updates, make no mention of adding or changing a button. Thus, updating toolbar

27   software over a network without user intervention accurately captures what the "character as a

28

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

1  whole" of the claims is "directed to." *Enfish*, 822 F.3d at 1335.

2     MyMail contends, however, that in light of the Court's construction of "toolbar" as "a

3  button bar that can be dynamically changed or updated via a Pinger process or a MOT script," the

4  patents "are not directed at the abstract idea of merely 'updating toolbar software over a network

5  without user intervention.'" Opp. at 7.  For the reasons stated below, despite the invocation of a

6  Pinger process and a MOT script, the Court disagrees.  Put simply, the patents' specifications

7  confirm that the claims' "character as a whole" is "directed to" updating toolbar software over a

8  network without user intervention.  The Court first analyzes the functions of the "Pinger process"

9  and then proceeds to analyze the functions of the "MOT script."  The Court then determines the

10  claims' "character as a whole" in light of these functions.

11         a.   The "Pinger Process"

12     The patents' specifications describe the "Pinger process" as a process that:

> [C]omprises an entity that acts transparently as a "services" coordinator to
> provide and/or administer the following:
>
> 1.  Heartbeat service to help maintain network connectivity with a client.
> 2.  Authentication services that securely authenticate client access to email,
>     commerce, and other public and private network servers and services.
> 3.  Update services that can perform client software, database, and
>     maintenance services during periods of inactivity.

'863 Patent col. 10:19-29.  More specifically, the specifications describe that:

> The pinger is initiated by the client dispatch application **200** upon connection
> to the network **100.** The client dispatch application **200** transmits header
> information to the access server **106** using the IP address of the access server
> **106.**  The header information includes the current user ID, account owner ID,
> PAP ID, the current IP address assigned to the user **110,** Group ID, the users
> system's current time, database (**204, 206, 208, 210**) revisions levels, and client
> dispatch application **200** and other related software revision levels.  With this
> information, the access server **106** determines whether a user **110** is making two
> connections while only paying for one and thus needs to be disconnected, or is
> a user **110** that needs a database or file update.

*Id.* at col. 12:16-28.  Furthermore, the specifications additionally state that:

> The pinger function causes the client dispatch application **200** to transmit
> header information to the access service **106,** as set forth in the "Send
> Information To Server (Pinger)" block.  The header information may include a

19

> Unique Identification string for the user (user ID, PAP ID, etc.), a unique computer identification string (IP address, etc.), time stamp information, and revision information for the client dispatch application **200** and databases **204, 206, 208, 210,** as described earlier.  After receipt, the access service **106** reviews the header information to determine what, if any, updates are required to be made to the user client's dispatch application, databases, or network access devices operating system.  Such updates may include: new dial-in locations, new identification information such as PAP IDs, network authentication passwords such as PAP passwords, other IDs, other passwords, change of phone numbers, change of area codes, low cost ISP, dial-in location priority sequence numbers, or any combination thereof, or any other information relating to gaining access to the ISP **102.**  If any updates are required, these are supplied by the access service **106** and any necessary updates will take place transparent (automatic while the user is logged on) to the user **110** as part of the "True" process path emanating from the "Transparent Update Required?" decision block.

*Id.* at col. 17:32-55.  Accordingly, "the pinger process (transparent to the user) allows the client dispatch application **200** and the access service **106** to interact and download database updates . . . to the user." *Id.* at col. 12:33-36.

Based on the above, the specifications show that the "Pinger process" operates in several steps when the Pinger process dynamically changes or updates the "toolbar."  First, the Pinger process triggers transmission of "header information" from the "client dispatch application" to the "access service." *Id.* at col. 12:16-19; 17:32-34.  This "header information" contains various information, including "revision information" for the "button bar database," which the invention uses to update the toolbar. *Id.* at col. 12:19-24; 17:35-40.  The "Pinger process" then causes "the access service **106** [to] review[] the header information to determine what, if any, updates [to the toolbar] are required." *Id.* at col. 17:40-42; *see also id.* at col. 12:25-28.  Lastly, the Pinger process provides that "[i]f any updates [to the toolbar] are required[,] these are supplied by the access service **106** and any necessary [toolbar] updates will take place transparent (automatic while the user is logged on) to the user **110**." *Id.* at col. 17:50-53.  As such, the Pinger process operates to (1) transmit update-related data, (2) review that data to determine if an update is required, and then to, if necessary, (3) send an update.

In its opposition, MyMail fails to explain the function of the Pinger process and instead opts to repeat at length the Court's construction of "toolbar." Opp. at 7-11.  The Court's analysis

20

of the Pinger process, however, is consistent with MyMail's previous characterization of the Pinger process. Specifically, in MyMail's opposition to Defendants' first motion for judgment on the pleadings, MyMail described the Pinger process as follows:

> The asserted patents explain one embodiment for performing this function involving a toolbar using a "pinger" process for obtaining updates to the toolbar database. When the user connects to the Internet, [1] the user's machine "dispatches an initial 'pinger' message to the access service 106 via the Internet 100." `863 Patent at 11:44-47; `070 Patent at 11:51-54. The pinger message includes information such as the current database revision levels. From this information, [2] the access service determines if the end-user's device should receive updated toolbar data and, if so, [3] send the updated toolbar data. `863 Patent at 11: 47-52 and 17:30-44; `070 Patent at 11:54-61 and 17:38-52.

ECF No. 109 at 4 n.5.

b. The "MOT Script"

The Court next addresses the "MOT script." Again, MyMail fails to explain the function of the MOT script and instead opts to repeat at length the Court's construction of "toolbar." *See* Opp. at 7-11.

As an initial matter, the specifications state that "MOT is not [] an acronym for anything meaningful," but that MOT is "an interpretive [script] language" "used by the Pinger and elsewhere in [the patent.]" '863 Patent col. 12:48-51. Accordingly, the patents' specifications offer substantially less detail as to the operation of the MOT script than the Pinger process.

However, despite the lack of meaning of "MOT," the specifications highlight the MOT script as a process that operates to send and use data to update the toolbar. Specifically, the MOT script "can be a 'mime-type' definition part of an E-mail message, an HTTP web document download and so forth, which *transparently automates the Toolbar update*." *Id.* at col. 10:32-35 (emphasis added). The specifications state that the:

> MOT script defines how to build a button bar using the button bar database **210** and its database entries. The MOT script is typically associated with a Web page and when the user **110** clicks on the Web page, the MOT script associated with the Web page is read back by the client dispatch application **200**. The client dispatch application **200** uses the particular MOT script and the button bar database **210** information and builds the button bar automatically according to the MOT script specifications.

21

*Id.* at col. 11:5-14.

The patents' specifications also highlight the MOT script as an alternative to the Pinger

process, and the specifications state that:

> While the pinger process (transparent to the user) allows the client dispatch
> application **200** and the access service **106** to interact and download database
> updates (or other information) to the user **110**, there is an alternative way to
> provide the updates to the databases, etc. at the request of the user **110**. The
> access service **106** may provide a Web page whereby when the user **110** clicks
> on the Web page, a MOT script and other data associated with the Web page is
> transmitted from the Web page site to the client dispatch application **106**. This
> gives the user **110** the capability to request a data update (or to receive other
> information). Alternatively[,] a MOT script and other data can be transmitted
> via an email message, an FTP (file transfer procedure) site or other similar
> networking storage and transport mechanism to the client dispatch application.

*Id.* at col. 12:33-47.

Accordingly, as with the Pinger process, when the MOT script dynamically changes or

updates the toolbar, the MOT script transmits data, analyzes data, and then "transparently

automates the Toolbar update." *Id.* at col. 10:34-35. Specifically, "an E-mail message [] or an

HTTP web document download and so forth" first transmits the MOT script "to the client dispatch

application." *Id.* at col. 10:33-34, 12:41. The "client dispatch application" can then "read back"

the "MOT script." *Id.* at col. 11:9-10. Following this, "[t]he client dispatch application **200** uses

the particular MOT script and the button bar database **210** information and builds the [toolbar]

automatically." *Id.* at col. 11:10-13.

c.  The Claims' "Character as a Whole" In Light of the Functions of the Pinger
Process and MOT Script

The above demonstrates that both the Pinger process and the MOT script function to

(1) transmit data, (2) analyze that data to determine whether a toolbar update is required, and

(3) facilitate the toolbar update if required. These functions are nearly identical to the steps that

the claims recite. Namely, the claims recite a process of (1) sending data from a toolbar database

to a server; (2) analyzing the data to determine whether the toolbar needs to be updated; (3) if the

toolbar needs to be updated, sending toolbar update data from the Internet; and (4) automatically

updating the toolbar in accordance with the toolbar update data. *See* '863 Patent col. 29:28-63;

1    '070 Patent col. 29:40-30:20.

2        Because the patents' claims share nearly identical functions as the Pinger process and the

3    MOT script, the Court concludes that even in light of the Court's construction of "toolbar" as "a

4    button bar that can be dynamically changed or updated via a Pinger process or a MOT script," the

5    claims' "character as a whole" is  "directed to" updating toolbar software over a network without

6    user intervention.

7        **2.   Precedent Establishes That the Claims are Directed to an Abstract Idea**

8        The Court now compares the claims "to those claims already found to be directed to an

9    abstract idea in previous cases." *Enfish*, 822 F.3d at 1334.

10       First, the Court finds that the claims are analogous to claims that fall within the category of

11   gathering and processing information, which the Federal Circuit has established is an abstract idea.

12   Specifically, in *FairWarning IP, LLC v. Iatric Systems, Inc.*, the Federal Circuit considered a set

13   of claims that recited a method of detecting fraud and misuse of personal health information; this

14   method  "collects information regarding accesses of a patient's personal health information,

15   analyzes the information according to one of several rules . . . to determine if the activity indicates

16   improper access, and provides notification if it determines that improper access has occurred."

17   839 F.3d 1089, 1093 (Fed. Cir. 2016).  *FairWarning* concluded that the claims were directed to an

18   abstract idea because the claims were "directed to a combination" of three "abstract-idea

19   categories": (1) collecting information; (2) analyzing information; and (3) presenting the results of

20   the collection and analysis of information.  839 F.3d at 1093-94.  Similarly, in *West View*

21   *Research, LLC v. Audi AG*, 685 Fed. App'x 923, 926 (Fed. Cir. 2017), the Federal Circuit held

22   that claims that "do not go beyond receiving or collecting data queries, analyzing the data query,

23   retrieving and processing the information constituting a response to the initial data query, and

24   generating a visual or audio response to the initial data query" were directed to the abstract idea of

25   collecting, analyzing, and displaying information.

26       Like the claims in *FairWarning* and *West View Research*, the claims in the instant case

27   recite a process for transmitting data, analyzing data, and generating a response based on that

28

United States District Court
Northern District of California

transmitted data.  Specifically, the claims recite a process of receiving and analyzing data to
determine whether a toolbar requires an update, and if so, sending updated toolbar data and
updating the toolbar.  Moreover, as addressed above, the function of the Pinger process and the
MOT script are nearly identical to the claims' recited process.  Particularly, the Pinger process and
the MOT script similarly comprise a process of transmitting data pertaining to a toolbar update,
analyzing that data to determine if a toolbar update is required, and then facilitating a toolbar
update if needed.  As such, even after this Court's construction of "toolbar," the claims remain
analogous to the claims in *FairWarning* and *West View Research*.

Second, the Court finds that the claims are analogous to claims that other district courts
have held to be directed to an abstract idea because the claims relate to using communications
networks to update software stored on computers.  For example, in *Personalized Media
Communications, LLC v. Amazon.com, Inc.*, 161 F. Supp. 3d 325 (D. Del. 2015), *aff'd*, 671 F.
App'x 777 (Fed. Cir. 2016) (per curiam), the United States District Court for the District of
Delaware addressed the patent-eligibility of, inter alia, claims directed to a process for updating
the operating system software stored on a remote computer via a transmission network.
Specifically, the claims at issue in *Personalized Media Communications* recited an updating
process comprised of (1) transmitting information about the specific version of the operating
system of a remote receiver station to a "signal detector"; (2) determining whether the specific
version matches a "designated version"; (3) if the specific version matches the "designated
version," sending updated operating system instructions to the remote receiver station, erasing the
remote receiver station's previous operating system instructions, and storing the updated operating
system instructions in the receiver station's memory.  *Id.* at 331-32.  The *Personalized Media*
court held that those claims were directed to "the abstract idea of updating operating instructions."
*Id.* at 332.  The *Personalized Media* court also stated that "[o]ther than the fact that the method
[disclosed by the claims] is implemented on a computer, it is no different from checking to see if a
copy of the Federal Rules is up to date, and, if it is not, replacing it with a new one."  *Id.*

The claims at issue here are similar to the claims in *Personalized Media*.  Like the

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

1    *Personalized Media* claims, the claims in the instant case recite a process of updating software

2    wherein the process is comprised of transmitting information about the software, determining

3    based on that information whether the software needs to be updated, and if so, sending updated

4    data to the device containing the software.  As addressed above, this is true even though the claims

5    now invoke a Pinger process or a MOT script, as both the Pinger process and the MOT script

6    function in the same manner.  Thus, even with the toolbar's ability to be dynamically changed or

7    updated via a Pinger process or a MOT script, the claims appear "no different from checking to

8    see if a copy of the Federal Rules is up to date, and, if it is not, replacing it with a new one."

9    *Personalized Media*, 161 F. Supp. 3d at 332.  As the Federal Circuit has stated, "mere automation

10   of manual processes using generic computers does not constitute a patentable improvement in

11   computer technology." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed.

12   Cir. 2017).

13        The claims in the instant case are also analogous to one set of claims considered in

14   *Intellectual Ventures I, LLC v. Motorola Mobility LLC*, 81 F. Supp. 3d 356 (D. Del. 2015).  In

15   *Intellectual Ventures I*, the relevant claims, "[w]hen broken into their fundamental elements,"

16   recited: "(1) presenting a directory of software updates at [a] user station; (2) selecting and

17   transmitting the desired software updates; and (3) receiving the requested software updates."  *Id.* at

18   365-66.  The court in *Intellectual Ventures I* noted that those claims "generically recite[d] the steps

19   of 'presenting,' 'sending,' and 'receiving,' with no description of the underlying programming."

20   *Id.* at 366.  The court also stated that "the limitations provided by the dependent claims—that the

21   software updates be 'automatically installed on the user station' over 'the Internet'—do not make

22   the claimed invention any less abstract."  *Id.*  Based on this analysis, the court concluded that "the

23   claims [were] directed to the abstract idea of distributing software updates to a computer."  *Id.*

24        The same is true of the claims at issue in the instant case.  Specifically, like in *Intellectual

25   Ventures I*, the focus of the instant claims is on distributing updated software to a computer

26   through the Internet—particularly distributing updated toolbar software.  As discussed above, this

27   is true even though the claims now invoke a Pinger process and a MOT script.  Again, as the

28
Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

United States District Court
Northern District of California

1    Federal Circuit has stated, "mere automation of manual processes using generic computers does

2    not constitute a patentable improvement in computer technology." *Credit Acceptance Corp.*, 859

3    F.3d at 1055.

4         MyMail's opposition's only response to this extensive Federal Circuit and district court

5    case law is that because the claims utilize "a specific process for updating a toolbar automatically

6    without user intervention—*i.e.*, dynamically, via a Pinger process or a MOT script—and not just

7    any means for doing so," that alone is enough to conclude that "the asserted claims are not

8    directed at an abstract idea."  Opp. at 9.  Specifically, MyMail asserts that the claims "improve[]

9    the functioning of the software updating process by invoking the capability of using a Pinger

10   process or a MOT script." *Id.*  In other words, MyMail argues specifically that the toolbar's

11   ability to be dynamically changed or updated via a Pinger process or a MOT script is a "specific

12   and improved way of updating a toolbar." *Id.* at 2; *see also id.* at 12 ("The claimed

13   invention . . . improves upon what was previously done with toolbars by adding the 'Pinger

14   process/MOT script' requirement.").

15        The Court disagrees for at least three reasons.  First, MyMail conclusorily claims an

16   improvement, but never identifies what the specific improvement is, despite the Federal Circuit's

17   requirement that claims assert a "specific asserted improvement."  *See McRO*, 837 F.3d at 1314-15

18   (claims are directed to a specific improvement where the claims "focused on a specific asserted

19   improvement").  Second, MyMail fails to explain *how* the toolbar's ability to be dynamically

20   changed or updated via a Pinger process or a MOT script improves the toolbar update process.

21   Moreover, MyMail fails to identify how the toolbar's ability to be dynamically changed or

22   updated via a Pinger process or a MOT script is a non-abstract improvement to computer

23   technology.  *See Enfish*, 822 F.3d at 1335 (claims are directed to a specific improvement where

24   the invention made "non-abstract improvements to computer technology").  Finally, the Federal

25   Circuit has held that claims are directed to a specific improvement where the claims used "a

26   *specific implementation* of a *solution to a problem* [in the prior art]." *Id.* at 1339 (emphasis

27   added).  In the instant case, MyMail fails to identify how the toolbar's ability to be dynamically

United States District Court
Northern District of California

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

28

1   changed or updated via a Pinger process or a MOT script is a specific implementation of a solution

2   to a problem in the prior art.

3        Although MyMail's opposition to the instant motion claims that the toolbar's ability to be

4   dynamically changed or updated via a Pinger process and a MOT script is an improvement, the

5   specifications do not.   Moreover, the specifications fail to identify what *actual benefit or*

6   *improvement* the Pinger process or the MOT script confer upon the toolbar update.  *See* '863

7   Patent col. 10:15-17.  The Court agrees with Defendants that the specifications do not identify

8   how the Pinger process or the MOT script benefit "[toolbar] update techniques by making [the

9   toolbar update process] more powerful, more efficient, or more sophisticated."  Reply at 4.

10        Furthermore, although the specifications list "at least ten problems" that "the present

11   invention solves," none of these problems relate to the toolbar update.  *See* '863 Patent col. 4:56-

12   5:28.  MyMail never even argues that the toolbar update relates to any of these problems.  *See*

13   Opp. at 7-11.  Indeed, none of the "ten problems" even reference a "toolbar" or any process for

14   updating a toolbar.  *See* '863 Patent col. 4:56-5:28.  Instead the "problems" appear to focus

15   primarily on "the need for a computer user to configure and reconfigure computer networking

16   software for network access."  *See id.*  Even if the Court were to generously construe these "ten

17   problems" to cover a toolbar update process, the specifications do not tie the ability of the toolbar

18   to be dynamically changed or updated via a Pinger process or a MOT script to solving *any* of these

19   problems, or to solving *any* additional problems that were present in the industry at the time of the

20   invention.  *See id.*  Accordingly, not only do the specifications fail to identify any problem in

21   preexisting toolbar update processes, the specifications also fail to show how the toolbar's ability

22   to be dynamically changed or updated via a Pinger process or a MOT script provides any benefit

23   whatsoever.  As such, in stark contrast to *Enfish* and *McRO*, the specifications here do not identify

24   the toolbar's ability to be dynamically changed or updated via a Pinger process or a MOT script as

25   "a specific implementation of a solution to a problem in the software arts."  *Enfish*, 822 F.3d at

26   1339; *see also McRO* 837 F.3d at 1314 ("Claim 1 of the [] patent is focused on a specific asserted

27   improvement in computer animation.").

28

*United States District Court*
*Northern District of California*

27

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

1    MyMail's opposition only confirms the Court's conclusion.  MyMail's opposition simply

2    argues that the Pinger process and the MOT script are "a specific, new, and useful method of

3    [updating toolbar software]," but MyMail relies solely on vague, conclusory statements and never

4    explains how this is so.  Opp. at 10.  For example, MyMail's opposition states, "The claimed

5    invention does not simply use a computer to automate what was done previously, but rather

6    improves upon what was previously done with toolbars by adding the 'Pinger process/MOT script'

7    requirement."  Opp. at 12.  MyMail's vague and conclusory statements fail to identify the specific

8    improvement, fail to explain how computer technology is improved, and fail to identify a problem

9    in the prior art that is solved.  Such vague and conclusory statements do not suffice.  *See Yu v.*

10   *Apple, Inc.*, --- F. Supp. 3d ---, 2020 WL 1429773, at *4 (N.D. Cal. Mar. 24, 2020) ("Yu also says

11   that the architecture in claim 1 is a specific improvement to a technical problem, and so not an

12   abstract idea under step 1.  But Yu presents this point only as a conclusory allegation, with no

13   facts alleged in support."); *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, 2015

14   WL 3637740, at *6 n.2 (N.D. Ill. June 11, 2015) ("The mere fact that a patent asserts that it

15   represents an improvement on prior art does not, of course, suffice.").

16        Failure to identify the specific improvement, failure to explain how the computer

17   technology is improved, and failure to identify a problem in the prior art that is solved do not

18   demonstrate that the asserted claims are directed to an "asserted improvement" rather than an

19   abstract idea.  *TriPlay, Inc. v. WhatsApp Inc.*, 2018 WL 1479027, at *8 (D. Del. Mar. 27, 2018),

20   *aff'd*, 771 Fed. App'x 492 (Fed. Cir. 2019) ("[T]he specification describes the claimed invention.

21   But it never really seems to clearly articulate . . . what problems remained unsolved as to those

22   prior art systems, and/or how the use of these components as a part of a messaging system

23   provided an improvement over the prior art." (quotation marks omitted)); *see id*. (invalidating

24   patent because, among other things, "the specification here is silent as to what the specific claimed

25   improvement is [and] how it differs from the prior art").

26        For these reasons, this instant case is unlike *Koninklijke KPN N.V. v. Gemalto M2M*

27   *GmbH*, 942 F.3d 1143 (Fed. Cir. 2019), on which MyMail relies.  *See* Opp. at 9-10.  In

28

United States District Court
Northern District of California

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

*Koninklijke*, the Federal Circuit found that a set of claims were "directed to a non-abstract improvement in an existing technological process." *Id.* at 1150. However, in *Koninklijke*, the Federal Circuit held that "a review of the specification ma[de] clear that [the invention] provide[d] [a] technological benefit." *Id.* at 1152. Indeed, even in *Koninklijke*, the Federal Circuit stated that for a claim to be directed to a specific improvement, "the claims must recite a specific means or method that *solves a problem in an existing technological process*." *Id.* at 1150 (emphasis added); *see also Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, --- F.3d ---, 2020 WL 2071951, at *4 (Fed. Cir. Apr. 30, 2020) (holding claims were directed to a patent-eligible improvement to computer functionality because the claims recited specific means of improving a problem in the prior art, "namely the reduction of latency experienced by parked secondary stations in communications systems"). In contrast to *Koninklijke*, the '863 Patent and the '070 Patent fail to identify "a problem in an existing technological process" that is solved by the toolbar's ability to be dynamically changed or updated via a Pinger process or a MOT script. *Id.* Thus, *Koninklijke* is inapplicable to the claims at issue here.

Therefore, the Court rejects MyMail's notion that the toolbar's capability of being dynamically changed or updated via a Pinger process or a MOT script changes the claims "character as a whole" and renders the claims directed to a specific improvement for updating toolbar software. Instead, the Court finds that the claims at issue here are directed to the abstract idea of updating toolbar software over a network without user intervention. Therefore, the Court proceeds to *Alice* step two.

## B. *Alice* Step Two

"In step two of the *Alice* inquiry, [the Court] search[es] for an 'inventive concept sufficient to transform the nature of the claim into a patent-eligible application.'" *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) (quoting *McRO*, 837 F.3d at 1312 (internal quotation marks omitted)). This inventive concept "must be significantly more than the abstract idea itself," *BASCOM*, 827 F.3d at 1349, "must be more than well-understood, routine, conventional activity," *Affinity Labs of Texas, LLC v. DIRECTV*, 838 F.3d 1253, 1262 (Fed. Cir.

29

1    2016), "and cannot simply be an instruction to implement or apply the abstract idea on a

2    computer." *BASCOM*, 827 F.3d at 1349.

3         When the Court first addressed the *Alice* step two inquiry in Defendant's first motion for

4    judgment on the pleadings, the Court concluded that "none of the elements of the claims at

5    issue . . . provided an inventive concept." ECF No. 129 at 22. Specifically, the Court found that

6    "[a]ll the hardware components recited in the claims are generic, conventional components," and

7    that "the claims call on these conventional components to perform their routine functions." *Id.*

8    However, as stated above, a divided Federal Circuit panel vacated the Court's holding, *see*

9    *MyMail*, 934 F.3d at 1380-81, and the Court subsequently construed the claim term "toolbar" as "a

10   button bar that can be dynamically changed or updated via a Pinger process or a MOT script." *See*

11   Claim Constr. Order. Accordingly, the Court performs the *Alice* step two inquiry in light of the

12   Court's construction of "toolbar."

13        In Defendants' renewed motion, Defendants argue that "the Court's prior analysis remains

14   applicable to the claims as construed" because "the [Pinger process and the MOT script] merely

15   represent[] a conduit through which the toolbar is updated" and which does not improve the

16   "toolbar update process." Mot. at 16. Moreover, Defendants argue that even after the Court's

17   construction, that the construed claims merely "recite generic steps that are performed routinely by

18   computers and servers." *Id.* at 15.

19        In opposition, MyMail argues that the "Pinger process/MOT script limitations imposed by

20   the specification and specified in the Court's claim construction add the inventive concept

21   required by [*Alice*] step two." Opp. at 11. Further, MyMail argues that three PTAB decisions, as

22   well as statements within the patents' specifications, create at least a question of fact as to whether

23   the Pinger process or the MOT script provide an "inventive concept." *See id.*

24        The Court first addresses whether there is an "inventive concept" sufficient to satisfy *Alice*

25   step two. The Court then turns to MyMail's argument that statements in the specifications and the

26   three prior PTAB decisions create an issue of fact which would preclude dismissal.

27        **1. There is No Inventive Concept Sufficient to Satisfy *Alice* Step Two**

28
     Case No. 17-CV-04488-LHK
     ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

*United States District Court*
*Northern District of California*

1

2

3

4

5

6

7

8

9

10

11

12

13

United States District Court
Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

At the outset, the Court notes that MyMail only argues that the toolbar's capability to be dynamically changed or updated via a Pinger process or a MOT script provides the "inventive concept" necessary to satisfy *Alice* step two.  *See* Opp. at 11-15.  Put differently, the only argument MyMail raises in the opposition is that the toolbar's ability to be dynamically changed or updated via a Pinger process or a MOT script is a "specific and improved way of updating a toolbar."  *Id*. at 2; *see also* Opp. at 12 ("The claimed invention . . . improves upon what was previously done with toolbars by adding the 'Pinger process/MOT script' requirement."). However, even if the Court considers the claims' other components beyond the Pinger process and MOT script, the Court concludes that none of the elements provide an inventive concept.

First, the claims fail the *Alice* step two inquiry because the components—including the Pinger process and MOT script—are all generic and function in a conventional manner. Specifically, the claims recite a "user Internet device" and a server, and the specifications refer only to generic Internet-connected computers and servers.

Moreover, the claims call on these conventional components to perform their routine functions, including "displaying" a toolbar, "sending" and "receiving" information, "determining" something based on that information, and "initiating . . . an operation to update" the toolbar software.  *See id.* at col. 29:28-63.  No language in the claims or the specifications "demonstrat[es] that the generic computer components function in an unconventional manner or employ sufficiently specific programming."  *Intellectual Ventures I*, 81 F. Supp. 3d at 367.  Instead, the functions recited by the claims at issue—that is, "displaying," "sending," "receiving," "determining," and "initiating"—are "specified at a high level of generality," which the Federal Circuit has found to be "insufficient to supply an inventive concept."  *Ultramercial*, 772 F.3d at 716.

Furthermore, the "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script" is also insufficient to add an inventive concept because the Pinger process and the MOT script merely use generic components in a conventional manner when dynamically changing or updating the toolbar.

31

In particular, when the Pinger process and the MOT script dynamically change or update the toolbar, the Pinger process and the MOT script use a "client dispatch application," an "access server," and various "databases." *See, e.g.*, '863 Patent col. 12:33-47.  However, the specifications describe the "client dispatch application" as merely a "program" that provides various pieces of information and "provides basic configuration and initialization information . . . to the user's computer." *Id.* at col. 6:31-53 (describing the "client dispatch application").  Further, the specifications define the "access service" as comprised of "one or more network servers/databases," which "include[] a computer system having one or more processors, memory, and support hardware." *Id.* at 11:25-30.  The specifications do not identify any of these components as unique to the invention, and MyMail does not argue that any individual component of the Pinger process or the MOT script is non-conventional or non-generic. *See* Opp. at 11-15.

Indeed, the Federal Circuit has held that similar components are generic. *See, e.g.*, *Mortg. Grader*, 811 F.3d at 1324-25 (holding that "interface," "network," and "database" were generic); *In re TLI Commc'ns LLC*, 823 F.3d at 613 (holding that "telephone unit," "server," "image analysis unit," and "control unit" were generic).   As a result, the Court finds that the components that the Pinger process and the MOT script use when they dynamically change or update the toolbar are "generic computer components." *Intellectual Ventures I*, 81 F. Supp. 3d at 367.

Further, the specifications indicate that the components of the Pinger process and the MOT script function in a conventional and well-understood manner when they dynamically change or update the toolbar.  For instance, the specifications state the generic components "transmit[] header information," '863 Patent col. 12:18; "determine[] whether a user . . . needs a database or file update," *id.* at col 12:25-28; "download database updates," *id.* at col. 12:35; and "build[] the [toolbar]," *id.* at col. 11:13.  These steps are merely the well-understood and routine process one would perform to determine if a toolbar needs to be updated and then to update the toolbar if necessary—specifically checking to see if a toolbar needs an update and sending an update if needed.  Moreover, the Federal Circuit has held that functions such as "sending and receiving data" are "well-understood, routine activit[ies]." *TLI Commc'ns LLC*, 823 F.3d at 614 (citing

1    *Alice*, 573 U.S. at 225).

2         Indeed, MyMail does not present any argument that the Pinger process and the MOT script

3    themselves function in any specific manner that is more than the conventional and well-

4    understood steps of checking toolbar data to determine whether the toolbar needs an update, and if

5    so, updating the toolbar.  In fact, the "specification[s] [are] silent as to" as to how the Pinger

6    process or the MOT script "differ[] from the prior art, or how any inventive feature . . . is used in

7    an unconventional manner."  *TriPlay*, 2018 WL 1479027, at *8.  Instead, MyMail only vaguely

8    and conclusorily states that "[t]he claimed invention . . . improves upon what was previously done

9    with toolbars by adding the 'Pinger process/MOT script' requirement."  Opp. 12.

10        As a result, the Court concludes that when the Pinger process and the MOT script

11   dynamically change or update the toolbar they use generic computer components and that those

12   generic components function in a manner that does not "override[] the routine and conventional

13   sequence of events" involved in updating a toolbar.  *DDR Holdings*, 773 F.3d at 1256.

14   Accordingly, the patents fail to satisfy *Alice* step two because their components are all generic

15   components which function in a conventional manner.

16        Second, the Court also finds that the toolbar's ability to be dynamically changed or

17   updated via a Pinger process or a MOT script only implements the claims' abstract idea, which

18   itself cannot provide an inventive concept.  As discussed above, in the context of the toolbar

19   update, the Pinger process and the MOT script simply function to update toolbar software over a

20   network without user intervention—the precise abstract idea to which the claims are directed.

21   However, the Federal Circuit has routinely held that a claim's mere use of an abstract idea cannot

22   satisfy *Alice* step two.  *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir.

23   2018) ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to

24   which it is directed cannot supply the inventive concept that renders the invention 'significantly

25   more' than the ineligible concept."); *see also ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d

26   759, 774 (Fed. Cir. 2019) ("In essence, the alleged 'inventive concept' that solves problems

27   identified in the field is that charging stations are networked-controlled.  But network control is

28

United States District Court
Northern District of California

33

1    the abstract idea itself [and thus cannot supply the inventive concept].").  Therefore, the toolbar's

2    mere ability to be dynamically changed or updated via a Pinger process or a MOT script—which

3    the Pinger process and the MOT script do via generic computer components in a conventional

4    manner—is insufficient to add an "inventive concept."

5           Third, although MyMail does not raise this argument, the Court also finds that the ordered

6    combination of the elements in the claims at issue does not yield an inventive concept, even in

7    light of the Court's construction of "toolbar."  Even as an ordered combination, the claims at issue

8    do not recite a process for updating software that deviates from the "routine and conventional"

9    updating process.  *DDR Holdings*, 773 F.3d at 1258-59.  On the contrary, as discussed above, both

10   the claims and the Pinger process and the MOT script use the conventional and well-understood

11   steps of checking toolbar data to determine whether the toolbar needs an update, and if so,

12   updating the toolbar.  Thus, much like the claims in *Intellectual Ventures I*, "instead of overriding

13   a routine sequence of events," the instant claims apply generic components performing their

14   routine functions "to automate the delivery of software updates."  81 F. Supp. 3d at 367.  The

15   specifications in the instant case further confirm this conclusion because nothing in the

16   specifications remotely suggests that the claims produce a result that "overrides the routine and

17   conventional sequence of events" for updating software on a computer.  *DDR Holdings*, 773 F.3d

18   at 1258-59.  Indeed, the specifications are entirely "silent as to . . . how any inventive feature,

19   alone or in an ordered combination, is used in an unconventional manner."  *Triplay*, 2018 WL

20   1479027, at *8.

21          Finally, the Court notes that this analysis accords with United States Circuit Judge Alan

22   Lourie's dissenting opinion in *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373 (Fed. Cir. 2019).

23   There, the majority of a Federal Circuit panel reversed the Court for not having construed

24   "toolbar" and did not reach the *Alice* inquiry or discuss either the Pinger process or the MOT

25   script.  *See id.* at 1378-81.  However, Judge Lourie addressed the *Alice* inquiry, including the

26   Pinger process and the MOT script, and found that "the claims at issue are clearly abstract

27   regardless of claim construction."  *Id.* at 1381 (Lourie, J., dissenting).  Judge Lourie further stated

28

34

United States District Court
Northern District of California

that "[w]hile 'inventive programming' may provide an inventive concept in some circumstances, no such programming is disclosed here." *Id.* Specifically, Judge Lourie concluded that "the specification is clear that *neither the unclaimed pinger process nor the unclaimed MOT script can be the inventive concept.*" *Id.* (emphasis added). Although Defendants cite Judge Lourie's dissent in Defendants' renewed motion for judgment on the pleadings, *see* Mot. at 6-7, MyMail fails to respond to, or even acknowledge, Judge Lourie's dissent. *See* Opp. 11-15. Additionally, nothing in the Court's claim construction order alters Judge Lourie's analysis. *MyMail*, 934 F.3d at 1381 (Lourie, J., dissenting) ("[T]he claims at issue are clearly abstract regardless of claim construction.").

As such, the Court finds that neither the claims themselves, nor the Court's construction of "toolbar" as "a button bar that can be dynamically changed or updated via a Pinger process or a MOT script" confers an "inventive concept."

### 2. MyMail Fails to Create a Dispute of Fact That the Pinger Process and the MOT Script Operate in a Manner to Supply an "Inventive Concept"

The Court now turns to MyMail's argument that dismissal is precluded by the specifications' use of the phrase "unique propert[y]," as well as three prior PTAB decisions which upheld the validity of the patents. *See* Opp. at 13.

First, the Court rejects MyMail's argument that because the patents' specifications state that the "ability to be dynamically changed or updated via a Pinger process or a MOT script is a '*unique property*' of the invention," that "this assertion *alone* is sufficient to preclude a dismissal of MyMail's claims." *Id.* (emphasis added). Specifically, MyMail attempts to rely on *Berkheimer v. HP Inc.* and *Aatrix Software, Inc. v. Green Shades Software, Inc.* to create an issue of fact that would preclude dismissal. *Id.* (citing *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), and *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121 (Fed. Cir. 2018)).

In *Berkheimer*, the Federal Circuit held that "[w]hile patent eligibility is ultimately a question of law, . . . [w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." 881 F.3d at 1369; *see also Aatrix*, 882

Case No. 17-CV-04488-LHK
ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS

1    F.3d at 1128 (Fed. Cir. 2018) ("Whether the claim elements or the claimed combination are well-

2    understood, routine, conventional is a question of fact.").  However, in *Berkheimer*, "[t]he

3    specification describe[d] an inventive feature that stores parsed data in a *purportedly*

4    *unconventional manner*."  *Id.* (emphasis added).  Further, "[t]he specification state[d] that storing

5    object structures in the archive without substantial redundancy *improve[d] system operating*

6    *efficiency and reduce[d] storage costs*."  *Id.* at 1370 (emphasis added).  Given the allegations

7    present in the specification, the Federal Circuit held that there was "at least a genuine issue of

8    material fact" as to whether the "inventive feature" was "well-understood, routine, and

9    conventional."  *Id.* at 1370.

10        The Federal Circuit ruled similarly in *Aatrix* and held that because "[t]here [were] concrete

11   allegations in the second amended complaint that individual elements and the claimed

12   combination are not well-understood, routine, or conventional activity," questions of fact

13   precluded dismissal at the motion to dismiss stage.  *See* 882 F.3d at 1128.

14        *Berkheimer* and *Aatrix* are distinguishable from the instant case for at least the following

15   three reasons.  First, unlike *Berkheimer* and *Aatrix*, the Complaint in the instant case and the

16   specifications of the '863 and '070 Patents fail to identify the toolbar's ability to be dynamically

17   changed or updated via a Pinger process or a MOT script as an "inventive concept."  The

18   Complaint in the instant case fails to even mention a Pinger process or a MOT script.  *See* Compl.

19   ¶¶ 7-9 (describing the '863 and '070 Patents without reference to the Pinger process or the MOT

20   script).

21        Second, *Berkheimer* and *Aatrix* identified concrete inventive concepts.  By contrast, as

22   discussed above, MyMail's Complaint, specifications, and opposition fail to identify what the

23   specific improvement is and fail to identify how the toolbar's ability to be dynamically changed or

24   updated via a Pinger process or a MOT script improves the toolbar update process or solves any

25   problem in the prior art.  Indeed, the specifications do not even identify any problems that existed

26   in prior art toolbar update processes.

27        Third, as discussed above, MyMail's specifications and opposition lack any allegation that

28

                                                   36

1    either the Pinger process or the MOT script themselves use non-generic or non-conventional

2    components to function in an unconventional or non-routine manner.  For instance, when the

3    Pinger process and the MOT script dynamically change or update the toolbar, the Pinger process

4    and the MOT script use a "client dispatch application," an "access server," and various

5    "databases." *See, e.g.*, '863 Patent col. 12:33-47.  However, the specifications describe the "client

6    dispatch application" as merely a "program" that provides various pieces of information and

7    "provides basic configuration and initialization information . . . to the user's computer." *Id.* at col.

8    6:31-53 (describing the "client dispatch application").  Further, the specifications define the

9    "access service" as comprised of "one or more network servers/databases," which "include[] a

10   computer system having one or more processors, memory, and support hardware." *Id.* at col.

11   11:25-30.  The specifications do not identify any of these components as unique to the invention

12   or identify any functions as an "inventive concept."

13        Moreover, as explained above, the specifications state that the generic components

14   "transmit[] header information," '863 Patent col. 12:18; "determine[] whether a user . . . needs a

15   database or file update," *id.* at col 12:25-28; "download database updates," *id.* at col. 12:35; and

16   "build[] the [toolbar]," *id.* at col. 11:13.  These steps are merely the well-understood and routine

17   process one would perform to determine if a toolbar needs to be updated and then to update the

18   toolbar if necessary.  *TLI Commc'ns LLC*, 823 F.3d at 614 (holding that "sending and receiving

19   data" are "well-understood, routine activit[ies]").

20        As a result, the '863 and '070 Patents are distinct from those in *Berkheimer* and *Aatrix*.

21   *See Berkheimer*, 881 F.3d at 1369-70 (describing the patent's specifications and the allegedly

22   "unconventional" elements); *Aatrix*, 882 F.3d at 1128 ("There are concrete allegations in the

23   second amended complaint that individual elements and the claimed combination are not well-

24   understood, routine, or conventional activity.").  Specifically, as in *TriPlay*, the specifications here

25   are "silent as to what the specific claimed improvement is" or what is unconventional with regard

26   to a toolbar being dynamically changed or updated via a Pinger process or a MOT script.  *Triplay*,

27   2018 WL 1479027, at *8 ("Unlike, for instance, the claims involved in [*Berkheimer*], the

28

37

specification here is silent as to what the specific claimed improvement is, how it differs from the prior art, or how any inventive feature, alone or as an ordered combination, is used in an unconventional manner."); *see also WhitServe LLC v. Donuts Inc.*, 390 F. Supp. 3d 571, 581 (D. Del. 2019), *aff'd*, --- Fed. App'x ---, 2020 WL 1815758 (Fed. Cir. Apr. 10, 2020) ("Here, *Berkheimer* and *Aatrix* are inapplicable because neither the patent nor the complaint alleges any improvement in technology.").

MyMail's opposition's sole response is that the '863 and '070 Patents state that the "toolbar's ability to be dynamically changed or updated via a Pinger process or a MOT script is a 'unique property' of the invention" and that "[t]his assertion alone is sufficient to preclude [] dismissal." Opp. at 13, This single conclusory statement is insufficient to create an issue of fact. '863 Patent col. 10:15-17; *see Triplay*, 2018 WL 1479027, at *8 ("Unlike, for instance, the claims involved in [*Berkheimer*], the specification here is silent as to what the specific claimed improvement is, how it differs from the prior art, or how any inventive feature, alone or as an ordered combination, is used in an unconventional manner."); *see also WhitServe*, 390 F. Supp. at 581 ("Here, *Berkheimer* and *Aatrix* are inapplicable because neither the patent nor the complaint alleges any improvement in technology.").

Therefore, the Court concludes that the '863 and '070 Patents' reference to the toolbar's ability to be dynamically changed or updated via a Pinger process or a MOT script as a "unique property" is insufficient to preclude dismissal.

Second, the Court also rejects MyMail's attempt to rely on three prior PTAB decisions to "show that there is a plausible basis for MyMail's contention that the Pinger process/MOT script . . . was not a well-understood, routine and conventional method." *See* Opp. at 13. On three separate occasions the PTAB has upheld the validity of the '863 and '070 Patents during inter partes review proceedings ("IPR") based on, in part, the Pinger process and the MOT script. *See generally* ECF No. 140-2 (IPR2018-00117) (denying institution of IPR for the '070 Patent); ECF No. 140-3 (IPR2018-00118) (denying institution of IPR for the '863 Patent); and ECF No. 140-4 (IPR2017-00967) (final written decision upholding validity of the '863 Patent). However, in IPR

38

United States District Court
Northern District of California

1  proceedings, the PTAB can only address validity under §§ 102 and 103—inquiries that are vastly

2  different from the current assessment of subject-matter eligibility under § 101. *Neptune Generics,*

3  *LLC v. Eli Lilly & Co.*, 921 F.3d 1372, 1378 (Fed. Cir. 2019) ("Congress expressly limited the

4  scope of inter partes review to a subset of grounds that can be raised under 35 U.S.C. §§ 102 &

5  103." (citing 35 U.S.C. § 311(b))). As the United States Supreme Court has stated, "The 'novelty'

6  of any element or steps in a process, or even of the process itself, is of no relevance in determining

7  whether the subject matter of a claim falls within the § 101 categories of possibly patentable

8  subject matter." *Diamond*, 450 U.S at 188-89. Accordingly, the Federal Circuit has held that "it

9  is not enough for [§ 101] subject-matter eligibility that claimed techniques be novel and

10  nonobvious in light of prior art, passing muster under 35 U.S.C. §§ 102 and 103." *SAP Am., Inc.*

11  *v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018). Thus, the PTAB's assessment of validity

12  under §§ 102 and 103 is irrelevant to the Court's assessment under § 101. As a result, the Court

13  rejects MyMail's attempt to rely on the PTAB decisions to demonstrate that the Pinger process or

14  the MOT script provide an "inventive concept."

15         In sum, because the Court finds at *Alice* step one that the claims are directed to an abstract

16  idea and at step two that there is no inventive concept sufficient to save the claims, the Court

17  concludes that the asserted claims are patent-ineligible under § 101. Defendants' renewed motion

18  for judgment on the pleadings is therefore GRANTED.

19  **IV.    CONCLUSION**

20         For the foregoing reasons, the Court GRANTS Defendants' renewed motion for judgment

21  on the pleadings.

22  **IT IS SO ORDERED.**

23  Dated: May 7, 2020

24
                                              _Lucy H. Koh_
25                                            _____
                                              LUCY H. KOH
26                                            United States District Judge

27

28
   Case No. 17-CV-04488-LHK
   ORDER GRANTING DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS